720 F.2d 231
 222 U.S.P.Q. 101, 1983 Copr.L.Dec. P 25,584
 WARNER BROS. INC., Film Export, A.G., and DC Comics Inc.,
Plaintiffs- Appellants-Cross-Appellees,
v.
AMERICAN BROADCASTING COMPANIES, INC. and Stephen J. Cannell
Productions, Defendants-Appellees-Cross-Appellants.
 No. 850, Dockets 82-7152, 82-7794.
 United States Court of Appeals,
Second Circuit.
 Argued March 16, 1983.
Decided Oct. 6, 1983.
 
 Stuart Robinowitz, New York City (Steven B. Rosenfeld, Kenneth Roth, Andrew J. Frackman, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on brief), for plaintiffs-appellants-cross-appellees.
 Richard J. Barnes, New York City (Mary D. Faucher and Townley & Updike, New York City, on brief), for defendant-appellee-cross-appellant Stephen J. Cannell Productions.
 Laura V. Jones, New York City (Philip R. Forlenza and Hawkins, Delafield & Wood, New York City, on brief), for defendant-appellee-cross-appellant American Broadcasting Companies, Inc.
 Before MANSFIELD, MESKILL and NEWMAN, Circuit Judges.
 NEWMAN, Circuit Judge:
 
 
 1
 The primary issue raised by this appeal is whether as a matter of law the fictional character Ralph Hinkley, the principal figure in a television series, "The Greatest American Hero," is not sufficiently similar to the fictional character Superman, the hero of comic books, television, and more recently films, so that claims of copyright infringement and unfair competition may be dismissed without consideration by a jury. The appeal is from a January 22, 1982, judgment of the District Court for the Southern District of New York (Constance Baker Motley, Chief Judge) dismissing claims of plaintiffs Warner Bros., Inc., Film Export, A.G., and DC Comics, Inc. against defendant American Broadcasting Companies, Inc. (ABC) and third-party defendant Stephen J. Cannell Productions upon the granting of defendants' motion for summary judgment. Defendants cross-appeal from the denial of their motion to amend the judgment to award attorney's fees and additional costs beyond those allowed under Fed.R.Civ.P. 54(d). For the reasons that follow, we affirm the judgment.
 
 I.
 
 2
 Many of the significant facts are set out in our prior opinion affirming the denial of plaintiffs' motion for a preliminary injunction. Warner Bros. Inc. v. American Broadcasting Companies, Inc., 654 F.2d 204 (2d Cir.1981). Plaintiffs own the copyrights in various works embodying the character Superman and have thereby acquired copyright protection for the character itself. See Detective Comics, Inc. v. Bruns Publications, Inc., 111 F.2d 432 (2d Cir.1940). Since the creation of Superman in 1938, plaintiffs have exploited their rights with great success, portraying Superman in several media and licensing the character for a variety of merchandising purposes. Through plaintiffs' efforts, Superman has attained an extremely high degree of exposure and recognition.
 
 
 3
 In 1978, building on previous Superman works, plaintiff Warner Bros., Inc. released a motion picture entitled "Superman, The Movie" (Superman I ) and more recently two sequels. Our prior opinion in this case summarizes the manner in which Superman I recounts the Superman legend:
 
 
 4
 The character is depicted as a superhuman being from a fictional planet, Krypton, who was sent to earth to escape the fatal consequences of the imminent destruction of his planet. Superman is found by the Kents, a midwestern couple, who name the boy Clark and raise him as their son in a bucolic setting. The Kents instill in Clark a strong sense of moral conviction and faith in the "American way," and counsel the boy not to reveal his superhuman powers to anyone. Clark matures into a tall, well-built, dark-haired, and strikingly handsome young man. Ultimately, Clark leaves his pastoral home, finding himself drawn by a mysterious force to a place where he encounters the image of his deceased father, Jor-El. There, Jor-El informs him of his true identity and instructs him to use his superpowers to protect the world from evil. Clark emerges from his fantastic encounter with Jor-El wearing for the first time his Superman costume--a skin-tight blue leotard with red briefs, boots and cape, and a large "S" emblazoned in red and gold upon the chest and cape.
 
 
 5
 Clark subsequently obtains a position as a reporter for the Daily Planet, but reveals his true identity to no one, assuming instead the appearance of a shy, bumbling, but well-intentioned young man. There he soon meets and becomes infatuated with a beautiful colleague, Lois Lane. Later he appears clad in his Superman regalia to perform amazing feats of strength and courage which immediately attract wide attention, acclaim, and the amorous interest of Lois Lane.
 
 
 6
 Superman is continually confronted by villains in all of his adventures, but eventually overcomes all evil opponents by exploiting his superpowers of self-propelled flight, imperviousness to bullets, blinding speed, X-ray vision, fantastic hearing, and seemingly immeasurable strength.
 
 
 7
 654 F.2d at 206.
 
 
 8
 In Superman I and in previous Superman works, Superman is portrayed as a brave, fearless hero, endowed with superhuman powers. His strength, speed, vision, and hearing far exceed the physical capabilities of mere mortals. He is impervious to bullets. In early works, Superman displayed extraordinary leaping ability, see Detective Comics, Inc. v. Bruns Publications, Inc., supra, 111 F.2d at 433; in later works this skill had become the power of flight, as Superman is regularly seen soaring through the sky, arms stretched ahead, then landing agilely on his feet ready for action. Superman engages in a series of exploits against assorted criminals and villains who pose threats not only to public safety but also to national security and even world peace. Regardless of his adversary, Superman always prevails.
 
 
 9
 Descriptions of Superman and lines of dialogue in the Superman works have become as well known as the Superman character. He is described as "faster than a speeding bullet," "more powerful than a locomotive," and "able to leap tall buildings in a single bound," and he always fights for "truth, justice, and the American way." From the early comic books continuing through the modern films, startled pedestrians have shouted, "Look! Up in the sky! ... It's a bird! ... It's a plane! ... It's Superman!"
 
 
 10
 The substantial commercial success of Superman I and the attendant publicity prompted many requests for licenses permitting use of the Superman character in connection with the merchandising of toys, greeting cards, apparel, and other products. It also led ABC to seek a license for production of a television series about "Superboy" based on the early adventures of Superman. Plaintiffs, who were planning to make their own sequels and derivative works, refused ABC permission to proceed with its proposed project.
 
 
 11
 Unable to obtain this license, ABC assigned to Cannell, the principal of the third-party defendant production company,[1] the task of creating a "pilot" program for a TV series involving a superhero. Cannell produced a program, and subsequently a weekly series, entitled "The Greatest American Hero" (Hero ), which he described as being about "what happens when you [the average person] become Superman." Hero's protagonist, Ralph Hinkley, was given attributes intended to identify him as an "ordinary guy." Hinkley is portrayed as a young high school teacher attempting to cope with a recent divorce, a dispute over the custody of his son, and the strain that his domestic problems place upon his work and his relationship with his girlfriend. Although Hinkley is attractive, his physical appearance is not imposing: he is of medium height with a slight build and curly, somewhat unkempt, blond hair.
 
 
 12
 In the pilot show, as described on the prior appeal:
 
 
 13
 Hinkley's van breaks down en route to a high school field trip in the desert. While walking along a road in search of help, Hinkley is nearly run over by an out-of-control automobile driven by Bill Maxwell, an American undercover agent. Maxwell has been searching the desert for his missing FBI partner who, unbeknownst to Maxwell, has been murdered by a band of extremists. Maxwell and Hinkley are suddenly approached by a brightly glowing spaceship from which descends the image of Maxwell's deceased partner. Hinkley is handed a magical caped costume--a red leotard with a tunic top, no boots, and a black cape--which, when worn, endows him with fantastic powers. Unfortunately, however, Hinkley loses the instruction book that accompanied the intergalactic gift and is left only with the verbal instruction that he should use his powers to save the world from self-destruction. Hinkley grudgingly accepts the mission after being importuned to do so by Maxwell.
 
 
 14
 654 F.2d at 206-07.
 
 
 15
 Hinkley's magical costume endows him with superhuman speed and strength, the ability to fly, imperviousness to bullets, and what Cannell calls "holographic vision," the power to perceive sights and sounds occurring out of his line of vision. Partly for lack of the instruction book that accompanied the costume and partly because some of his character traits remain dominant when he is wearing the suit, Hinkley as a superhero is not an unqualified success. He uses his superpowers awkwardly and fearfully. When flying, Hinkley shouts with fright and makes crash-landings, sometimes crumpling in a heap or skidding nearly out of control to a stop. Though protected from bullets by his costume, Hinkley cringes and cowers when shot at by villains.
 
 
 16
 In the pilot episode of Hero, the reaction of the first man who sees Hinkley in his costume, which he has put on in a gas station washroom, is fear that Hinkley is some sort of pervert who may harm the man or his seven-year-old son, Jerry. While the man calls for the police, Jerry notices that Hinkley is trying to fly but does not know how. The youngster patiently explains that Hinkley must take three steps and jump vigorously into the air. Hinkley manages to get airborne, has difficulty steering, barely avoids colliding with a fire escape, and finally crashes into a brick wall, knocking himself out. Police officers arrest him and take him to a hospital, where he protests in vain to a nurse that he is not crazy.
 
 
 17
 Goaded by FBI Agent Maxwell into using his superpowers to combat villains, Hinkley, remains a reluctant hero. When Maxwell urges him to intercept the President's helicopter to warn the President of impending danger, Hinkley protests, "I'm Captain Crash! I navigate like I got hit by a can of Raid. This suit belongs in the Smithsonian. How'm I gonna buzz that chopper?" Despite his apprehensiveness, Hinkley saves the President's helicopter, then loses control of his flying ability, and crash-lands, skidding to a stop on his chest.
 
 
 18
 The Hero series contains several visual effects and lines that inevitably call Superman to mind, sometimes by way of brief imitation, sometimes by mention of Superman or another character from the Superman works, and sometimes by humorous parodying or ironic twisting of well-known Superman phrases. Hinkley's suit invests him with most of Superman's powers, and the suit, like Superman's, is a tight-fitting leotard with a chest insignia and a cape. Their outfits differ in that Superman wears a blue leotard with red briefs, boots, and cape, while Hinkley's costume is a red leotard with a tunic top, no boots, and a black cape. In one scene, as Hinkley is running at super speed, smoke emerges from his footsteps, and the sound of a locomotive is heard. A similar scene occurs in Superman I, though even without seeing the movie it would be difficult not to be reminded by the Hero scene of Superman, who is regularly described as "more powerful than a locomotive." When Hinkley first views himself in a mirror holding his costume in front of him, he says, "It's a bird ... it's a plane ... it's Ralph Hinkley." The youngster, Jerry, watching Hinkley's unsuccessful first effort to fly, tells him, "Superman wouldn't do it that way." In a scene with his girlfriend, who is aware of the powers that come with the magic costume, Hinkley says, "Look at it this way ... you're already one step up on Lois Lane. She never found out who Clark Kent really was."
 
 
 19
 In the three weeks before the first episode of Hero was televised, ABC conducted one of the most extensive promotional campaigns in the network's history, airing nearly 200 commercials, or "promos," each running five, ten, twenty, or thirty seconds. Most were slight variations of thirteen basic "promos."[2] By multiplying the number of "promos" by the estimated television audience at the time each was shown, plaintiffs estimate that the promotional campaign registered more than 2.4 billion viewer impressions. Some of the "promos" contained scenes created specially for the commercial, a departure from what plaintiffs contend is the normal industry practice of using only action scenes excerpted from episodes to be shown in the series.
 
 
 20
 Like the pilot episode, the "promos" show Hinkley displaying some Superman-like abilities in a decidedly unSuperman-like way. For example, Hinkley has the ability to fly, but does so carrying a large lantern and, on occasion, waves his arms wildly to maintain his course or crash lands into a treetop. He has superhuman strength, but, before succeeding in crashing through a wall to surprise the villians, his first attempt nearly knocks him out. Though protected from bullets by his suit, he cringes and covers his face with his arms when shots are fired. The "promos" also preview the Hero series device of referring to Superman characters or well-known Superman lines. Hinkley is shown admiring himself in his suit, saying, "It's a bird! It's a plane. It's Ralph!" In one of the basic "promos" an announcer gives this description of Hinkley:
 
 
 21
 He may be unable to leap tall buildings in a single bound, he may be slower than a speeding bullet and he may be less powerful than a locomotive ... but he's working on it. Give the poor guy a chance. He's just getting started. But when he gets it going there's no stopping him.
 
 
 22
 During this "promo" the viewer sees Hinkley crash into a tree and then a wall, and hears a bystander call him "butterfingers."
 
 
 23
 The "promos" include three other devices that plaintiffs assert provide special support for their copyright infringement and unfair competition claims. First, some of the "promos" show Hinkley flying (with his lantern) in outer space, with the earth as a background; plaintiffs contend this is an attempt to copy a scene from Superman I in which Superman performs exploits in outer space. Second, some of the "promos" show the Statue of Liberty, which plaintiffs contend is an attempt to copy a movie scene of Superman flying around the Statue. Third, in one of the "promos" Hinkley is shown watching a television set on which appears a brief clip from the television cartoon "Superfriends" showing the animated cartoon figure of Superman. In addition, plaintiffs assert that a special videotape prepared to promote the Hero series, which was shown to ABC's sponsors and affiliated stations, used excerpts from the music soundtrack of Superman I.
 
 
 24
 The complaint alleged copyright infringement in violation of section 101 of the Copyright Act of 1976, 17 U.S.C. Sec. 501 (Supp. V 1981), unfair competition in violation of the common law of New York, and impairment of the value of plaintiffs' trademarks and indicia associated with the Superman character in violation of New York's "anti-dilution" statute, N.Y.Gen.Bus.Law Sec. 368-d (McKinney 1968). Chief Judge Motley denied a preliminary injunction that would have barred the showing of the Hero series, 523 F.Supp. 611, and this Court affirmed, 654 F.2d 204. The defendants then moved for summary judgment and dismissal of the complaint. Chief Judge Motley initially denied that motion, and prepared the case for bifurcated jury trials of the copyright infringement and unfair competition claims, Fed.R.Civ.P. 42(b). Two specific copyright claims, those concerning the use of the Superman I music soundtrack in the special promotional videotape and the use of the clip from the "Superfriends" cartoon in one of the televised "promos," were ruled to be outside the scope of the litigation. The holder of the copyright in the Superman I music was not a party to this suit, and the claim concerning the "Superfriends" cartoon clip was not made until the eve of trial. Though the District Judge referred to these two claims as "severed," it is apparent that Chief Judge Motley simply declined to permit their addition to this lawsuit and left them available for determination in another case.[3]
 
 
 25
 Prior to the start of the trial the District Judge, apparently harboring doubts as to the need for a trial, conducted an extended pretrial conference, lasting two weeks, to afford an opportunity to review the evidence to be offered by the plaintiffs. In the course of the pretrial conference, Chief Judge Motley ruled that the responses to an audience survey commissioned by the plaintiffs were inadmissible, "because they were too general to be of any benefit to the jury with respect to ... the copyright claim."[4] The District Judge also excluded all expert testimony on the copyright claim, including testimony, sought to be introduced by plaintiffs, offered to show the inability of young children to perceive the differences between Hinkley and Superman.
 
 
 26
 On December 9, 1981, Chief Judge Motley granted partial summary judgment to defendants on the claim that their "promos" infringed plaintiffs' copyrights, but on all other issues reaffirmed her prior denial of summary judgment.[5] On December 16, 1981, the District Judge concluded that no reasonable jury could find that the parties' works were substantially similar and granted summary judgment to defendants on the entire copyright claim. Chief Judge Motley initially expressed an intention to certify the latter ruling for appeal, 28 U.S.C. Sec. 1292(b) (1976), and to stay proceedings on the unfair competition claims pending this Court's disposition of the copyright issue. However, after reconsidering the matter, she concluded that public confusion as to the origin of Hero was unlikely as a matter of law, and relied on this latter finding to preclude trial on the Lanham Act and common law unfair competition claims, and also on the New York "anti-dilution" claim. On January 20, 1982, the District Judge dismissed plaintiffs' complaint in a comprehensive opinion. 530 F.Supp. 1187. On September 27, 1982, the Court denied defendants' motion to amend the judgment to include an award of attorney's fees and additional costs.
 
 II.
 
 27
 The basic issues concerning the copyright infringement claim are whether the Hero and Superman works are substantially similar so as to support an inference of copying and whether the lack of substantial similarity is so clear as to fall outside the range of reasonably disputed fact questions requiring resolution by a jury. The similarity to be assessed must concern the expression of ideas, not the ideas themselves, Reyher v. Children's Television Workshop, 533 F.2d 87, 90-91 (2d Cir.), cert. denied, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir.1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), a distinction easier to assert than to apply, see Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir.1960) (decisions "inevitably ... ad hoc "). Though the issue of substantial similarity is frequently a fact issue for jury resolution, see Twentieth Century-Fox Film Corp. v. MCA, Inc., 715 F.2d 1327 (9th Cir.1983); Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir.), cert. denied, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980), we have recognized that a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only "non -copyrightable elements of the plaintiff's work," id., or because no reasonable jury, properly instructed, could find that the two works are substantially similar, Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905, 918 (2d Cir.1980). See Twentieth Century-Fox Film Corp. v. MCA, Inc., supra, at 1330 & n. 6; 3 Nimmer on Copyright Sec. 12.10 (1983) (hereafter "Nimmer"). Before assessing the District Court's determination that summary judgment was appropriate in this case, we consider the principles that guide decision in this area.
 
 
 28
 It is a fundamental objective of the copyright law to foster creativity. However, that law has the capacity both to augment and diminish the prospects for creativity. By assuring the author of an original work the exclusive benefits of whatever commercial success his or her work enjoys, the law obviously promotes creativity. At the same time, it can deter the creation of new works if authors are fearful that their creations will too readily be found to be substantially similar to preexisting works. The idea-expression dichotomy originated in the case law and is now codified in the statute, 17 U.S.C. Sec. 102(b) (Supp. V 1981), in an effort to enable courts to adjust the tension between these competing effects of copyright protection. Though imprecise, it remains a useful analytic tool for separating infringing from non-infringing works, especially when the essence of the work sought to be protected is a story and the allegedly infringing work is accused of what Professor Nimmer calls "comprehensive nonliteral similarity," 3 Nimmer Sec. 13.03[A], duplicating the "fundamental essence or structure" of a work, id. Confronting a claim of that sort, courts have often invoked Learned Hand's "abstractions" test,[6] or Professor Chaffee's "pattern" test.[7]
 
 
 29
 When, as in this case, the claim concerns infringement of a character, rather than a story, the idea-expression distinction has proved to be especially elusive. In Nichols, Hand applied his "abstractions" test in determining that neither the plot nor the characters of "Abie's Irish Rose" were infringed by a similar play called "The Cohens and the Kellys." He noted that no case then decided had found infringement of a character described only by written word, although he recognized the possibility that a literary character could be sufficiently delineated to support a claim of infringement by a second comer, 45 F.2d at 121. Copyrightability of a literary character has on occasion been recognized, Burroughs v. Metro-Goldwyn-Mayer, Inc., 519 F.Supp. 388, 391 (S.D.N.Y.1981) (Tarzan), aff'd with issue expressly left open, 683 F.2d 610, 621 (2d Cir.1982). However, there has been no doubt that copyright protection is available for characters portrayed in cartoons, even before Nichols, e.g., King Features Syndicate v. Fleischer, 299 Fed. 533 (2d Cir.1924) (Barney Google's horse, Spark Plug); Hill v. Whalen & Martell, Inc., 220 F. 359 (S.D.N.Y.1914) (Mutt and Jeff); see also Empire City Amusement Co. v. Wilton, 134 F. 132 (C.C.D.Mass.1903) (Alphonse and Gaston) (claim sustained against demurrer), and after Nichols, e.g., Walt Disney Productions v. Air Pirates, 581 F.2d 751 (9th Cir.), cert. denied, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1978) (Mickey Mouse and other Disney characters); Detective Comics, Inc. v. Bruns Publications, Inc., supra (Superman); see 1 Nimmer Sec. 2.12.
 
 
 30
 In determining whether a character in a second work infringes a cartoon character, courts have generally considered not only the visual resemblance but also the totality of the characters' attributes and traits. See Detective Comics, Inc. v. Bruns Publications, Inc., supra, 111 F.2d at 433; Warner Brothers, Inc. v. Film Ventures International, 403 F.Supp. 522, 525 (C.D.Cal.1975); see also Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157, 1167 n. 9, 1169 (9th Cir.1977) (H.R. Pufnstuf puppets created for children's television series). A pertinent consideration, formulated in a case concerning greeting cards in which characters were one element of the art work, Roth Greeting Cards v. United Card Co., 429 F.2d 1106, 1110 (9th Cir.1970), is the extent to which the allegedly infringing character captures the "total concept and feel" of the copyrighted character. See Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., supra, 562 F.2d at 1167 (puppets infringed); see also Eden Toys, Inc. v. Marshall Field & Co., 675 F.2d 498, 500 (2d Cir.1982) ("total concept and feel" pertinent but held lacking as to toy snowman).
 
 
 31
 A somewhat paradoxical aspect of infringement disputes, especially pertinent to claims of character infringement, concerns the attention courts give both to similarities and differences in the two works at issue. Professor Nimmer categorically asserts as a proposition, "It is entirely immaterial that in many respects plaintiff's and defendant's works are dissimilar if in other respects similarity as to a substantial element of plaintiff's work can be shown." 3 Nimmer Sec. 13.03[B] at 13-38. In Hand's pithy phrase, "[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate." Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir.), cert. denied, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936). Yet Professor Nimmer also recognizes, as a second proposition, that "a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's," 3 Nimmer Sec. 13.03[B] at 13-38.1 to -38.2, a proposition we recognized on the prior appeal of this case, 654 F.2d at 211, and elsewhere, Eden Toys, Inc. v. Marshall Field & Co., supra, 675 F.2d at 501; Durham Industries, Inc. v. Tomy Corp., supra, 630 F.2d at 913 & n. 11. The two propositions are not facially inconsistent; the second proposition contemplates a work that would be substantially similar if its author had not made changes from the plaintiff's work. Yet in practice the distinction between the two propositions has become somewhat blurred. We have observed that "numerous differences tend to undercut substantial similarity," id. at 913; see Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co., 509 F.2d 64, 65-66 (2d Cir.1974). This observation appears to go beyond Professor Nimmer's second proposition by emphasizing the significance of differences that do not necessarily change features of the plaintiff's work, but may be entirely additional. To that extent, the observation modifies the first proposition.
 
 
 32
 The tension between these two propositions perhaps results from their formulation in the context of literary works and their subsequent application to graphic and three-dimensional works. A story has a linear dimension: it begins, continues, and ends. If a defendant copies substantial portions of a plaintiff's sequence of events, he does not escape infringement by adding original episodes somewhere along the line. A graphic or three-dimensional work is created to be perceived as an entirety. Significant dissimilarities between two works of this sort inevitably lessen the similarity that would otherwise exist between the total perceptions of the two works. The graphic rendering of a character has aspects of both the linear, literary mode and the multi-dimensional total perception. What the character thinks, feels, says, and does and the descriptions conveyed by the author through the comments of other characters in the work episodically fill out a viewer's understanding of the character. At the same time, the visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted.
 
 
 33
 Ultimately, care must be taken to draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appearance, behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one. Stirring one's memory of a copyrighted character is not the same as appearing to be substantially similar to that character, and only the latter is infringement. See Ideal Toy Corp. v. Kenner Products Division of General Mills Fun Group, Inc., 443 F.Supp. 291, 305 (S.D.N.Y.1977).
 
 
 34
 An entirely separate issue of infringement, also posed by this case, concerns what Professor Nimmer calls "fragmented literal similarity," 3 Nimmer Sec. 13.03[A], duplicating the exact or nearly exact wording of a fragment of the protected work, id. With respect to such claims, courts have invoked two distinct doctrines. First, a de minimis rule has been applied, allowing the literal copying of a small and usually insignificant portion of the plaintiff's work. See, e.g., G.R. Leonard & Co. v. Stack, 386 F.2d 38 (7th Cir.1967); Werlin v. Reader's Digest Ass'n, Inc., 528 F.Supp. 451, 463-64 (S.D.N.Y.1981). Second, under the "fair use" doctrine, codified in 17 U.S.C. Sec. 107(2) (Supp. V 1981), courts have allowed the taking of words or phrases when adapted for use as commentary or parody, see, e.g., Elsmere Music, Inc. v. National Broadcasting Co., 623 F.2d 252 (2d Cir.1980) (per curiam); Berlin v. E.C. Publications, Inc., 329 F.2d 541 (2d Cir.), cert. denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964).
 
 
 35
 The "parody" branch of the "fair use" doctrine is itself a means of fostering the creativity protected by the copyright law. It also balances the public interest in the free flow of ideas with the copyright holder's interest in the exclusive use of his work. Especially in an era of mass communications, it is to be expected that phrases and other fragments of expression in a highly successful copyrighted work will become part of the language. That does not mean they lose all protection in the manner of a trade name that has become generic. See, e.g., King-Seeley Thermos Co. v. Aladdin Industries, 321 F.2d 577 (2d Cir.1963); Bayer Co. v. United Drug Co., 272 F. 505 (S.D.N.Y.1921). No matter how well known a copyrighted phrase becomes, its author is entitled to guard against its appropriation to promote the sale of commercial products. That doctrine enabled the proprietors of the Superman copyright to prevent a discount chain from using a television commercial that parodied well-known lines associated with Superman. D.C. Comics, Inc. v. Crazy Eddie, Inc., 205 U.S.P.Q. 1177 (S.D.N.Y.1979) ("Look! ... Up in the sky! ... It's a bird! ... It's a plane ... It's ... Crazy Eddie!"). But an original work of authorship with elements of parody, though undoubtedly created in the hope of commercial success, stands on a different footing from the products of a discount chain. Whatever aesthetic appeal such a work may have results from the creativity that the copyright law is designed to promote. It is decidedly in the interests of creativity, not piracy, to permit authors to take well-known phrases and fragments from copyrighted works and add their own contributions of commentary or humor.[8] After all, any work of sufficient notoriety to be the object of parody has already secured for its proprietor considerable financial benefit. According that proprietor further protection against parody does little to promote creativity, but it places a substantial inhibition upon the creativity of authors adept at using parody to entertain, inform, or stir public consciousness.
 
 
 36
 Applying these principles to this case, we conclude that Chief Judge Motley correctly entered summary judgment for the defendants on the claim of copyright infringement. Plaintiffs make no claim that the Hero pilot, subsequent episodes, or "promos" infringed the story of any Superman works. Their contention is that the Hero character, Ralph Hinkley, is substantially similar to Superman and that the Hero works impermissibly copied what plaintiffs call the "indicia" of Superman, a concept broad enough to include Superman's costume, his abilities, the well-known lines associated with him--in short, anything occurring in the Hero works that might remind a viewer of Superman.
 
 
 37
 The total perception of the Hinkley character is not substantially similar to that of Superman. On the contrary, it is profoundly different. Superman looks and acts like a brave, proud hero, who has dedicated his life to combating the forces of evil. Hinkley looks and acts like a timid, reluctant hero, who accepts his missions grudgingly and prefers to get on with his normal life. Superman performs his superhuman feats with skill, verve, and dash, clearly the master of his own destiny. Hinkley is perplexed by the superhuman powers his costume confers and uses them in a bumbling, comical fashion. In the genre of superheros, Hinkley follows Superman as, in the genre of detectives, Inspector Clouseau follows Sherlock Holmes.
 
 
 38
 However, we do not accept defendants' mode of analysis whereby every skill the two characters share is dismissed as an idea rather than a protected form of expression. That approach risks elimination of any copyright protection for a character, unless the allegedly infringing character looks and behaves exactly like the original. A character is an aggregation of the particular talents and traits his creator selected for him. That each one may be an idea does not diminish the expressive aspect of the combination. But just as similarity cannot be rejected by isolating as an idea each characteristic the characters have in common, it cannot be found when the total perception of all the ideas as expressed in each character is fundamentally different.
 
 
 39
 An infringement claim would surely be within the range of reasonable jury fact issues if a character strongly resembled Superman but displayed some trait inconsistent with the traditional Superman image. If a second comer endowed his character with Superman's general appearance, demeanor, and skills, but portrayed him in the service of the underworld, a jury would have to make the factual determination whether the second character was Superman gone astray or a new addition to the superhero genre. In this case, however, a reasonable jury could not conclude that Hinkley is substantially similar to the Superman character with only a change of name. The overall perception of the way Hinkley looks and acts marks him as a different, non-infringing character who simply has some of the superhuman traits popularized by the Superman character and now widely shared within the superhero genre.
 
 
 40
 The same considerations make evident the correctness of Chief Judge Motley's ruling that the "promos" for the Hero series present no jury issue concerning infringement of the Superman character. By aggregating the total number of viewer impressions made by all the showings of the thirteen basic "promos" and their minor variations, appellants imply, and we agree, that the visual impact of the series of "promos" should be primarily assessed. A viewer of an adequate sampling of the "promos" would necessarily be exposed to the Hinkley characteristics that distinguish him from Superman. In six of the thirteen basic "promos" Hinkley either flies out of control, crash lands, or cringes in cowardly fashion at the firing of bullets. In six other "promos" his flying, though uneventful, is aided (either for vision or balance) by carrying in one hand a large lantern.[9] It may be that within a series of generally non-infringing "promos" a single "promo" could be so substantially similar to a copyrighted character as to establish infringement or at least create a fair factual issue for jury consideration. Here, however, no single "promo" is that similar to the Superman character, and whatever recollections of Superman may be stirred by the "promos" showing Hinkley flying without incident are quickly dispelled by the remainder of the series in which his flying skills are decidedly not super. Nor does infringement arise because one "promo" shows the Statue of Liberty and another shows Hinkley flying in outer space with the earth in the background. Appellants' claim that these shots infringe scenes from Superman I is too extravagant to be maintained. The Statue of Liberty is a widely recognized symbol of the United States, available for portrayal in any fictional work, and Superman has no monopoly among fictional heroes on self-propelled flight in outer space.
 
 
 41
 That leaves for consideration on the infringement claim the use in the Hero episodes and "promos" of lines that either mention Superman and other characters from the Superman saga or incorporate phrases associated with Superman. The use of such lines is manifestly not infringement. In each instance the lines are used, not to create a similarity with the Superman works, but to highlight the differences, often to a humorous effect. Appellants acknowledge the contrasting point made by some of the Hero lines, but insist nevertheless that the point may not be appreciated by some of the viewers, especially young viewers who make up a significant share of the television audience for the Hero series. Appellants were prepared to offer expert testimony to show that some children would not perceive the negatives when the announcer says that Hinkley "may be unable to leap tall buildings in a single bound," "may be slower than a speeding bullet," and "may be less powerful than a locomotive." We do not doubt that some viewers may miss the point, but their misunderstanding does not establish infringement. Perhaps if Hero were a children's series, aired on Saturday mornings among the cartoon programs, we would have greater concern for the risk that lines intended to contrast Hinkley with Superman might be mistakenly understood to suggest that Hero was a Superman program. Cf. Ideal Toy Corp. v. Fab-Lu, Ltd., 261 F.Supp. 238, 241-42 (S.D.N.Y.1966) (children's perception of television commercial for dolls). But when a work is presented to a general audience of evening television viewers,[10] the possible misperception of some young viewers cannot prevent that audience from seeing a program that will readily be recognized by the "average lay observer," Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir.1966), as poking fun at, rather than copying, a copyrighted work.
 
 
 42
 Our conclusion is not altered by plaintiffs' proffered evidence of a survey of persons who viewed the Hero pilot. The survey reported, among other things, that of the 45% of those interviewed who said Hinkley reminded them of some other character, 74% (33% of the entire sample) said they were reminded of Superman. We appreciate the problem plaintiffs confronted in designing the survey. If they asked too pointed a question, e.g., "Do you think Hinkley is substantially similar to Superman?", they would have been faulted for using a leading question. On the other hand, their open-ended questions caused Chief Judge Motley to rule the entire survey inadmissible because the responses were "too general." 530 F.Supp. at 1197 n. 3. That dilemma simply illustrates the problems that arise when surveys are sought to be used as an aid in determining issues of copyright infringement. See Ideal Toy Corp. v. Kenner Products Division of General Mills Fun Group, Inc., supra, 443 F.Supp. at 304 (cautioning against "the dangerous precedent of allowing trial by the court to be replaced by trial by public opinion poll"). The "substantial similarity" that supports an inference of copying sufficient to establish infringement of a copyright is not a concept familiar to the public at large. It is a term to be used in a courtroom to strike a delicate balance between the protection to which authors are entitled under an act of Congress and the freedom that exists for all others to create their works outside the area protected against infringement. We need not and do not decide whether survey evidence of the sort tendered in this case would be admissible to aid a jury in resolving a claim of substantial similarity that lies within the range of reasonable factual dispute. However, when a trial judge has correctly ruled that two works are not substantially similar as a matter of law, that conclusion is not to be altered by the availability of survey evidence indicating that some people applying some standard of their own were reminded by one work of the other. Courts have an important responsibility in copyright cases to monitor the outer limits within which juries may determine reasonably disputed issues of fact. If a case lies beyond those limits, the contrary view of a properly drawn sample of the population, or even of a particular jury, cannot be permitted to enlarge (or diminish) the scope of statutory protection enjoyed by a copyright proprietor.
 
 III.
 
 43
 The unfair competition and trademark dilution claims present slightly different issues, but, as will appear, we agree with Chief Judge Motley that defendants were entitled to summary judgment on these claims as well as on the infringement claims. Preliminarily, plaintiffs contend that summary judgment was procedurally improper because it was entered by the District Court "sua sponte" and without consideration of all of the evidence they proposed to offer had the unfair competition claims gone to trial. We disagree.
 
 
 44
 Defendants moved for summary judgment with respect to the entire complaint, affording plaintiffs a full opportunity to submit memoranda and affidavits in opposition. After the District Court's initial denial of the motion, which was made prior to viewing all of the pertinent works, defendants appear to have renewed the motion orally, at least with respect to the infringement claims. Thereafter Chief Judge Motley granted the defendants partial summary judgment with respect to the infringement claims and expressed an intention to certify that ruling for appeal pursuant to 28 U.S.C. Sec. 1292(b) (1976). Upon further reflection and with the opportunity to consider the mass of plaintiffs' evidence presented during the two-week pretrial session, the District Court entered summary judgment for defendants on all of the claims.
 
 
 45
 Though we find no procedural error, we think the plaintiffs' point is not answered, as defendants contend, by the provision of Fed.R.Civ.P. 54(b) specifying that "any order or other form of decision ... which adjudicates fewer than all of the claims ... is subject to revision at any time before the entry of judgment adjudicating all the claims ...." The District Court's initial ruling denying summary judgment on all claims was not an order "adjudicating" any of them; it simply left them for adjudication at trial.[11] Normally, a trial court's reconsideration of a denial of summary judgment occurs upon presentation of a renewed motion for summary judgment. See 6 Moore's Federal Practice p 56.14 at 56-366 (2d ed. 1982). But whether or not the motion is renewed, a trial court has discretion to reconsider an interlocutory ruling, and no abuse of that discretion occurred here since the plaintiffs had a full opportunity to oppose the motion when first made and did not act to their detriment in reliance on the initial ruling. Moreover, the District Court accorded the plaintiffs extra consideration by reviewing nearly all of their proposed evidence before making a final decision, even though the essence of the claims could be determined by inspection of only the works in question.[12]
 
 
 46
 Turning to the merits of the unfair competition claims, we have noted that "the absence of substantial similarity leaves little basis for asserting a likelihood of confusion or palming off" for purposes of a claim under section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a) (1976), Durham Industries, Inc. v. Tomy Corp., supra, 630 F.2d at 918. We do not doubt that the image of a cartoon character and some indicia of that character can function as a trademark to identify the source of a work of entertainment, see DC Comics, Inc. v. Filmation Associates, 486 F.Supp. 1273 (S.D.N.Y.1980). But, as with claims of copyright infringement, courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source. Though likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ, see DC Comics Inc. v. Reel Fantasy, Inc., 696 F.2d 24 (2d Cir.1982), the issue is amenable to summary judgment in appropriate cases, B & L Sales Associates v. H. Daroff & Sons, Inc., 421 F.2d 352 (2d Cir.), cert. denied, 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970).
 
 
 47
 We agree with Chief Judge Motley that a visual comparison of the Superman works with the Hero series and "promos" establishes as a matter of law a lack of substantial similarity that would create a likelihood of confusion as to source. Our discussion of the differences in "total concept and feel" of the central characters of Superman and Hinkley applies to the issue of likelihood of confusion as well as to copyright infringement. We do not doubt that there may be some viewers among the television audience who think that the Hero series was produced or authorized by those responsible for the Superman movies, television series, or comics. Some may come to that conclusion with respect to every film or television program portraying a character with superhuman abilities. Perhaps some viewers think that every program with a dramatic courtroom lawyer was made by the producers of the Perry Mason series, or that every show featuring a doctor is a spin-off of the Marcus Welby series. The "average lay observer" test, however, must be applied by fact-finders within an outer limit of reasonable fact-finding marked by the courts. Otherwise the scope of protection a competitor is entitled to enjoy would be expanded far beyond what Congress prescribed in the Lanham Act. Thus, as we concluded with respect to the copyright claim, the availability of survey evidence indicating that some viewers associated the Hero series with Superman does not create a reasonably disputed factual issue of likelihood of confusion as to source when the works are as different as those in this case.
 
 
 48
 Appellants contend that summary judgment was inappropriate on the unfair competition claims because of the existence of evidence offered to show that defendants intended to make the Hero series confusingly similar to the Superman works. For example, plaintiffs cite the fact that Cannell rejected the first proposal for Hinkley's costume, a beige and yellow outfit with a white collar and "fold-up wings," and selected instead a red and black outfit with a cape, somewhat similar to Superman's red and blue costume. We have recognized that evidence of intentional copying raises a presumption that a second comer intended to create a confusing similarity of appearance and succeeded. Perfect Fit Industries, Inc. v. Acme Quilting Co., 618 F.2d 950, 954 (2d Cir.1980) (applying New York law). But if comparison of the works reveals no fair jury issue concerning likelihood of confusion, then intent to copy, even if found from the proffered evidence, would not establish a Lanham Act violation. See B & L Sales Associates v. H. Daroff & Sons, Inc., supra, 421 F.2d at 354; Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-le Coultre Watches, Inc., 221 F.2d 464, 466-67 (2d Cir.), cert. denied, 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955); Vitarroz Corp. v. River Brand Rice Mills, Inc., 266 F.Supp. 981, 986 (S.D.N.Y.1967).
 
 
 49
 We also recognize that lack of substantial similarity is not a complete answer to a Lanham Act claim, since a second comer can violate section 43(a) by falsely representing his goods as those of the trademark owner, see Sutton Cosmetics (P.R.) Inc. v. Lander Co., 455 F.2d 285, 287-88 (2d Cir.1972). A claim of "passing off" or "palming off" may be established even if the goods are not confusingly similar; the wrong is in the misrepresentation of a common source. However, in this case this aspect of the section 43(a) claim is also defeated as a matter of law by visual comparison of the works in question. Whether a television viewer could be misled into thinking that the Hero series was produced or authorized by those responsible for the Superman films depends on the extent to which the Hero programs and "promos" convey such a misrepresentation, even if it was not intended. See Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 648 & n. 7 (3d Cir.1958). Plainly there is no overt claim in this regard, and we agree with Chief Judge Motley that perceiving the materials through the eyes and ears of the average lay observer does not create a fair jury issue as to whether a misrepresentation of common source or sponsorship has been implied. The works are too fundamentally different, and the references in the Hero programs and "promos" to names and fragments of lines associated with Superman are pointedly made for purposes of contrast. See Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Chandris America Lines, Inc., 321 F.Supp. 707, 712 (S.D.N.Y.1971) ("The Greatest Show on Earth Isn't").
 
 
 50
 Plaintiffs fare no better to the extent that their claims are based on New York's common law of unfair competition or the state anti-dilution statute. We have recognized the breadth of New York's common law tort of unfair competition and have not hesitated to apply it to pirated audio-visual works, so long as the cause of action was not preempted by the Copyright Act of 1976, 17 U.S.C. Sec. 301 (Supp. V 1981). Roy Export Co. v. Columbia Broadcasting System, Inc., 672 F.2d 1095, 1097 nn. 1 & 2, 1104-06 (2d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). More recently, we have noted the preemptive effect of the 1976 Act with respect to a New York unfair competition claim. Arch Oboler and Nostalgia Lane, Inc. v. Goldin, 714 F.2d 211 at 213 (2d Cir.1983). We do not read Oboler to hold that all state unfair competition claims concerning works of authorship have been preempted. Since the Copyright Act is exclusive, after January 1, 1978, only with respect to rights "equivalent to any of the exclusive rights within the general scope of copyright," 17 U.S.C. Sec. 301(a) (Supp. V 1981), state law claims that rely on the misappropriation branch of unfair competition are preempted, see Durham Industries, Inc. v. Tomy Corp., supra, 630 F.2d at 918-19; 1 Nimmer Sec. 1.01[B]. However, to the extent that plaintiffs are relying on state unfair competition law to allege a tort of "passing off," they are not asserting rights equivalent to those protected by copyright and therefore do not encounter preemption. See id. Secs. 1.01[B] n. 47, 2.12 n. 25. Their claim fails nevertheless on the merits. The lack of a fairly triable issue of fact as to "passing off" defeats this aspect of the state law claim, just as it did the similar theory advanced under the Lanham Act.
 
 
 51
 Finally, to whatever extent plaintiffs' claims under New York's anti-dilution statute, N.Y.Gen.Bus.Law Sec. 368-d (McKinney 1968), do not involve rights equivalent to those protected by copyright and thereby escape preemption, they too fail on the merits as a matter of law. Though an anti-dilution claim may be established in the absence of likely confusion as to source, there must be a mark of sufficient distinction to warrant the statute's special protection and there must be a blurring or tarnishing of the plaintiff's mark sufficient to constitute dilution. Sally Gee, Inc. v. Myra Hogan, Inc., 699 F.2d 621, 624-26 (2d Cir.1983). Even if we assume that the Superman character and related indicia function as trademarks with the requisite distinctiveness, plaintiffs have failed as a matter of law to present a triable issue as to the blurring or tarnishing of their marks. Cf. Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204-05 & n. 8 (2d Cir.1979) (dilution by showing "sexually depraved film" using distinctive uniforms "almost identical" with those of plaintiffs). Even if Superman's trademarks are not as indestructible as the character that spawned them, no reasonable jury could find that the Hero series or "promos" blurred or tarnished those marks.
 
 IV.
 
 52
 The cross-appeal need not detain us. Though defendants were surely entitled to urge the District Judge that creativity and competition could be chilled by the prospect of defending litigation like this suit and that defendants should therefore be awarded attorney's fees under the Copyright and Lanham Acts, 17 U.S.C. Sec. 505 (Supp. V 1981); 15 U.S.C. Sec. 1117 (1976), for having to resist plaintiffs' claims, Chief Judge Motley's decision not to award fees and added costs was not an abuse of discretion.
 
 
 53
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 Cannell's production company was impleaded in this action as a third-party defendant pursuant to a contractual indemnification agreement with ABC
 
 
 [2]
 For example, as the date for the first Hero telecast approached, the "promos" would be modified to alert the audience to a program that was to be aired "next week," and then "tomorrow" and then "tonight." The basic "promos" were also varied to fit into time slots of different lengths
 
 
 [3]
 Since these two claims were not technically severed, leaving them for determination in a later lawsuit did not destroy the finality of the judgment that was entered dismissing all claims in this lawsuit. Cf. Fed.R.Civ.P. 54(b)
 
 
 [4]
 The survey asked the following three questions:
 (1) Was there anything about the character Ralph Hinkley that reminded you of any other character you had seen before?
 (2) Did any scenes from that TV movie [Hero ] remind you of scenes from any other TV programs or movies in theatres or on TV?
 (3) Aside from the actors, do you think that the people who wrote or made this movie were responsible for any other TV programs or movies in theatres or on TV?
 
 
 [5]
 At this juncture, Judge Motley had viewed all of the works at issue, including the series of episodes based on the Hero pilot, but had not yet completed her review of the documentary evidence and affidavits submitted by the parties
 
 
 [6]
 "Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended." Nichols v. Universal Pictures Corp., supra, 45 F.2d at 121
 
 
 [7]
 "No doubt, the line does lie somewhere between the author's idea and the precise form in which he wrote it down. I like to say that the protection covers the 'pattern' of the work ... the sequence of events, and the development of the interplay of characters." Chafee, Reflections on the Law of Copyright, 45 Colum.L.Rev. 503, 513-14 (1945)
 
 
 [8]
 We have no occasion in this case to consider the limiting principle that arises when attempts at parody take the form of scatological humor, see, e.g., MCA, Inc. v. Wilson, 677 F.2d 180 (2d Cir.1981); Walt Disney Productions v. Air Pirates, supra
 
 
 [9]
 The script for the Hero pilot explains that Hinkley's lantern is one of two portable landing lights that he has ripped from their moorings at a heliport as he prepares to fly toward the President's helicopter. In flight, he rolls to his right out of control. Hinkley then drops the landing light he has been carrying in his right hand and discovers that with the extra weight of the light in his left hand he is able to maintain his balance
 
 
 [10]
 Independent television audience surveys, not disputed by the parties, estimated that 60% of the Hero viewers were older than 20, and 73% were older than 12
 
 
 [11]
 The "subject to revision" language of Rule 54(b) underscores that a grant of partial summary judgment on one of several claims does not have res judicata effect prior to the entry of an appealable judgment. See 6 Moore's Federal Practice p 54.42 (1983)
 
 
 [12]
 The only significant evidence not considered was the testimony of several witnesses offered to show that the character and indicia of Superman had acquired secondary meaning, a point defendants have not disputed, and to show the strength of these marks, a point we may assume for purposes of this appeal