**CASTLE ROCK ENTERTAINMENT, INC., Plaintiff–Appellee,**

v.

**CAROL PUBLISHING GROUP, INC., Defendant–Cross Claimant– Appellant,**

**Beth B. Golub, Defendant–Cross Defendant–Appellant.**

**No. 97–7992.**

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1998.

Decided July 10, 1998.

Melvin L. Wulf, Beldock, Levine & Hoffman, LLP, New York City, for Defendants–Appellants.

David Dunn, Davis, Weber & Edwards, P.C., New York City, for Plaintiff–Appellee.

Before: VAN GRAAFEILAND and WALKER, Circuit Judges, and RAKOFF, District Judge.*

* The Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

JOHN M. WALKER, Jr., Circuit Judge:

This case presents two interesting and somewhat novel issues of copyright law. The first is whether *The Seinfeld Aptitude Test*, a trivia quiz book devoted exclusively to testing its readers' recollection of scenes and events from the fictional television series *Seinfeld*, takes sufficient protected expression from the original, as evidenced by the book's substantial similarity to the television series, such that, in the absence of any defenses, the book would infringe the copyright in *Seinfeld*. The second is whether *The Seinfeld Aptitude Test* (also referred to as *The SAT*) constitutes fair use of the *Seinfeld* television series.

Defendants-appellants Carol Publishing Group, Inc. and Beth B. Golub appeal from the July 23, 1997 judgment of the United States District Court for the Southern District of New York (Sonia Sotomayor, *District Judge*) granting, pursuant to Fed.R.Civ.P. 56, plaintiff-appellee Castle Rock Entertainment, Inc.'s ("Castle Rock") motion for summary judgment; denying defendants' cross-motion for summary judgment; awarding Castle Rock $403,000 for defendants' copyright infringement; and permanently enjoining defendants from publishing *The Seinfeld Aptitude Test*.

We conclude that *The SAT* unlawfully copies from *Seinfeld* and that its copying does not constitute fair use and thus is an actionable infringement. Accordingly, we affirm the judgment in favor of Castle Rock.

### Background

The material facts in this case are undisputed. Plaintiff Castle Rock is the producer and copyright owner of each episode of the *Seinfeld* television series. The series revolves around the petty tribulations in the lives of four single, adult friends in New York: Jerry Seinfeld, George Costanza, Elaine Benes, and Cosmo Kramer. Defendants are Beth Golub, the author, and Carol Publishing Group, Inc., the publisher, of *The SAT*, a 132–page book containing 643 trivia questions and answers about the events and characters depicted in *Seinfeld*. These include 211 multiple choice questions, in which only one out of three to five answers is correct; 93 matching questions; and a number of short-answer questions. The questions are divided into five levels of difficulty, labeled (in increasing order of difficulty) "Wuss Questions," "This, That, and the Other Questions," "Tough Monkey Questions," "Atomic Wedgie Questions," and "Master of Your Domain Questions." Selected examples from level 1 are indicative of the questions throughout *The SAT*:

1. To impress a woman, George passes himself off as

 a) a gynecologist

 b) a geologist

 c) a marine biologist

 d) a meteorologist

11. What candy does Kramer snack on while observing a surgical procedure from an operating-room balcony?

12. Who said, "I don't go for those nonrefundable deals ... I can't commit to a woman ... I'm not committing to an airline."?

 a) Jerry

 b) George

 c) Kramer [2]

The book draws from 84 of the 86 *Seinfeld* episodes that had been broadcast as of the

2. An example of the trivia quiz book's matching questions (entitled "Family Trees") is as follows:
 1. Cousin Jeffrey 2. Uncle Leo 3. Manya 4. Isaac 5. Mr. Seinfeld 6. Mrs. Seinfeld 7. Mr. Benes 8. Mr. Costanza 9. Mrs. Costanza 10. Mrs. Kramer.
 (a) Former condo association president
 (b) Drinks Colt 45 in the nude
 (c) Arm-grabbing, loquacious garbage can picker
 (d) Leaves a rent-controlled New York City apartment for the Phoenix sunshine
 (e) Gruff-talking, well-known novelist
 (f) New York City employee who watches the Nature Channel
 (g) Wears sneakers in the swimming pool and has to "get the good spot in front of the good building in the good neighborhood"
 (h) Enjoys the heat and never uses air conditioning
 (i) Elderly immigrant whose beloved pony was "the pride of Krakow"
 (j) Nagging, shrill-voiced *Glamour* magazine reader who was hospitalized for a back injury

time *The SAT* was published. Although Golub created the incorrect answers to the multiple choice questions, every question and correct answer has as its source a fictional moment in a *Seinfeld* episode. Forty-one questions and/or answers contain dialogue from *Seinfeld*. The single episode most drawn upon by *The SAT*, "The Cigar Store Indian," is the source of 20 questions that directly quote between 3.6% and 5.6% of that episode (defendants' and plaintiff's calculations, respectively).

The name "Seinfeld" appears prominently on the front and back covers of *The SAT*, and pictures of the principal actors in *Seinfeld* appear on the cover and on several pages of the book. On the back cover, a disclaimer states that "This book has not been approved or licensed by any entity involved in creating or producing *Seinfeld*." [3] The front cover bears the title "The Seinfeld Aptitude Test" and describes the book as containing "[h]undreds of spectacular questions of minute details from TV's greatest show about absolutely nothing." The back cover asks:

> Just how well do you command the buzzwords, peccadilloes, petty annoyances, and triflingly complex escapades of Jerry Seinfeld, Elaine Benes, George Costanza, and Kramer—the fabulously neurotic foursome that makes the offbeat hit TV series *Seinfeld* tick?
>
> . . . .
>
> If you think you know the answers—and really keep track of *Seinfeld* minutiae—challenge yourself and your friends with these 550 trivia questions and 10 extra matching quizzes. No, *The Seinfeld Aptitude Test* can't tell you whether you're Master of Your Domain, but it will certify your status as King or Queen of *Seinfeld* trivia. So twist open a Snapple, double-dip a chip, and open this book to satisfy your between-episode cravings.

Golub has described *The SAT* as a "natural outgrowth" of *Seinfeld* which, "like the *Seinfeld* show, is devoted to the trifling, picayune and petty annoyances encountered by the show's characters on a daily basis." According to Golub, she created *The SAT* by taking notes from *Seinfeld* programs at the time they were aired on television and subsequently reviewing videotapes of several of the episodes, as recorded by her or various friends.

*The SAT*'s publication did not immediately provoke a challenge. The National Broadcasting Corporation, which broadcasted *Seinfeld*, requested free copies of *The SAT* from defendants and distributed them together with promotions for the program. *Seinfeld*'s executive producer characterized *The SAT* as "a fun little book." There is no evidence that *The SAT*'s publication diminished *Seinfeld*'s profitability, and in fact *Seinfeld*'s audience grew after *The SAT* was first published.

Castle Rock has nevertheless been highly selective in marketing products associated with *Seinfeld*, rejecting numerous proposals from publishers seeking approval for a variety of projects related to the show. Castle Rock licensed one *Seinfeld* book, *The Entertainment Weekly Seinfeld Companion*, and has licensed the production of a CD–ROM product that includes discussions of *Seinfeld* episodes; the CD–ROM allegedly might ultimately include a trivia bank. Castle Rock claims in this litigation that it plans to pursue a more aggressive marketing strategy for *Seinfeld*-related products, including "publication of books relating to *Seinfeld*."

In November 1994, Castle Rock notified defendants of its copyright and trademark infringement claims. In February 1995, after defendants continued to distribute *The SAT*, Castle Rock filed this action alleging federal copyright and trademark infringement and state law unfair competition. Subsequently, both parties moved, pursuant to Fed.R.Civ.P. 56, for summary judgment on both the copyright and unfair competition claims.

The district court granted summary judgment to Castle Rock on the copyright claim. It held that defendants had violated plaintiff's copyrights in *Seinfeld* and that such copying did not constitute fair use. *See Castle Rock Entertainment v. Carol Publ'g Group, Inc.*, 955 F.Supp. 260, 274 (S.D.N.Y. 1997). The district court did not grant sum-

---

**3.** As noted later, this opinion does not address issues of trademark or unfair competition.

mary judgment to either party on the unfair competition claim. *See id.* The parties then stipulated to damages and attorneys' fees on the copyright infringement claim and, presumably to facilitate the appeal, to the dismissal without prejudice of all remaining claims. Carol Publishing's cross-claims against Golub were dismissed with prejudice. The district court entered final judgment on the copyright infringement claim, awarded Castle Rock $403,000 with interest, permanently enjoined defendants from publishing or distributing *The SAT,* and ordered defendants to destroy all copies of *The SAT* in their custody or control. Defendants now appeal.

*Discussion*

## I. *Standard of Review*

Summary judgment is appropriate only if the moving party can show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court "must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party." *Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 26 (2d Cir.1988). Although "[f]air use is a mixed question of law and fact," *Harper & Row, Publishers, Inc. v. Nation Enter.,* 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), this court has on a number of occasions "resolved fair use determinations at the summary judgment stage" where, as here, there are no genuine issues of material fact. *Wright v. Warner Books, Inc.,* 953 F.2d 731, 735 (2d Cir.1991); *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2d Cir.1998) (affirming summary judgment awarded to defendants on basis of fair use defense); *Harper & Row,* 471 U.S. at 560, 105 S.Ct. 2218. We review the district court's legal conclusions *de novo* and its findings of fact for clear error. *See American Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 918 (2d Cir.1994).

## II. *Copyright Infringement*

The Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. §§ 101–803, grants copyright owners a bundle of exclusive rights, including the rights to "reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work." *Id.* § 106. "Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying." *Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997); *see Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). There are two main components of this *prima facie* case of infringement: "a plaintiff must first show that his work was actually copied . . . . [and] then must show that the copying amounts to an improper or unlawful appropriation." *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139–40 (2d Cir.1992) (quotation marks and citations omitted). Actual copying may be established "either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Id.* at 140. As we have noted before, "probative," rather than "substantial" similarity is the correct term in referring to the plaintiff's initial burden of proving actual copying by indirect evidence. *See Webber,* 132 F.3d at 889 n. 1; *Laureyssens,* 964 F.2d at 140. "It is only after actual copying is established that one claiming infringement" then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears "substantial similarity" to protected expression in the earlier work. *Webber,* 132 F.3d at 889; *Laureyssens,* 964 F.2d at 140.

In the instant case, no one disputes that Castle Rock owns valid copyrights in the *Seinfeld* television programs and that defendants actually copied from those programs in creating *The SAT.* Golub freely admitted that she created *The SAT* by taking notes from *Seinfeld* programs at the time they were aired on television and subsequently reviewing videotapes of several of the episodes that she or her friends recorded. Since the fact of copying is acknowledged and undisputed, the critical question for decision is whether the copying was unlawful or improper in that it took a sufficient amount of protected expression from *Seinfeld* as evidenced by its substantial similarity to such expression.

**138**

### A. "Substantial Similarity"

We have stated that "substantial similarity"

requires that the copying [be] quantitatively *and* qualitatively sufficient to support the legal conclusion that infringement (*actionable* copying) has occurred. The qualitative component concerns the copying of expression, rather than ideas [, facts, works in the public domain, or any other non-protectable elements].... The quantitative component generally concerns the amount of the copyrighted work that is copied,

which must be more than "*de minimis.*" *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 75 (2d Cir.1997) (emphasis added).

 As to the quantitative element, we conclude that *The SAT* has crossed the *de minimis* threshold. At the outset, we observe that the fact that the copying appears in question and answer form is by itself without particular consequence: the trivia quiz copies fragments of *Seinfeld* in the same way that a collection of *Seinfeld* jokes or trivia would copy fragments of the series. In order to determine the quantitative extent of the defendants' copying, we must then decide whether to analyze separately the amount of expression copied from each individually copyrighted *Seinfeld* episode, or to analyze in the aggregate the amount copied from the eighty-four *Seinfeld* episodes. As defendants observe, 17 U.S.C. § 106 speaks throughout in the singular, referring to the allegedly infringed "work," thus bolstering an individual-episode analysis. Our precedents, however, tend to support the aggregate analysis. *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1372–73, 1381 (2d Cir.1993) (finding substantial similarity between infringing book and 8 episodes of *Twin Peaks* weekly television series seen as a whole, but awarding statutory damages on per-episode basis); *Wainwright Secs. Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977) (abstracts of a number of research reports treated cumulatively in fair use analysis); *see*

*also Craft v. Kobler,* 667 F.Supp. 120, 124–25 (S.D.N.Y.1987) (passages taken from 15 separate books of copyright holder treated cumulatively in finding infringement); *cf. New Era Publications Int'l, ApS v. Carol Publ'g Group,* 904 F.2d 152, 158 (2d Cir.1990) (in analyzing whether critical biography was fair use of 48 original writings, court noted that biography "uses overall a small percentage of [plaintiff's] *works* " but also noted that percentage of copying taken from each individual work was not "unfair") (emphasis added); *but see Salinger v. Random House, Inc.,* 811 F.2d 90, 98 (2d Cir.1987) (copying of Salinger letters not fair use because, among other factors, secondary work copied one-third of 17 letters and 10 percent of 42 letters).

As in *Twin Peaks,* for the purposes of the quantitative copying analysis we shall treat *Seinfeld*—a discrete, continuous television series—as a single work.[4] Where the secondary work focuses on an entire continuous television series such as *Seinfeld,* there is no basis for looking in isolation at the amount copied from each separately copyrighted episode. Although 17 U.S.C. § 106 speaks in terms of a singular copyrighted "work," it would elevate form over substance to conclude that *The SAT* 's copying of 643 fragments from 84 individually copyrighted *Seinfeld* episodes is indistinguishable from a case in which a 634–question trivia quiz book poses a few questions from each of 84 unrelated television programs, books, movies, or any combination of creative works that do not constitute a discrete series of works. Had *The SAT* copied a few fragments from each of 84 unrelated television programs (perhaps comprising the entire line-up on broadcast television), defendants would have a stronger case under the *de minimis* doctrine. By copying not a few but 643 fragments from the *Seinfeld* television series, however, *The SAT* has plainly crossed the quantitative copying threshold under *Ringgold.*

As to *Ringgold* 's qualitative component, each *SAT* trivia question is based directly upon original, protectable expression in *Seinfeld.* As noted by the district court, *The SAT* did not copy from *Seinfeld* unprotected

---

4. Because the parties have stipulated to damages, we need not address, as did *Twin Peaks,* whether damages should be assessed on a per-episode basis.

facts, but, rather, creative expression. *Cf. Feist*, 499 U.S. at 364, 111 S.Ct. 1282 (finding no infringement where defendant produced a multi-county phone directory, in part, by obtaining names and phone numbers from plaintiffs' single-county directory). Unlike the facts in a phone book, which "do not owe their origin to an act of authorship," *id.* at 347, 111 S.Ct. 1282, each "fact" tested by *The SAT* is in reality fictitious expression created by *Seinfeld's* authors. *The SAT* does not quiz such true facts as the identity of the actors in *Seinfeld*, the number of days it takes to shoot an episode, the biographies of the actors, the location of the *Seinfeld* set, etc. Rather, *The SAT* tests whether the reader knows that the character Jerry places a Pez dispenser on Elaine's leg during a piano recital, that Kramer enjoys going to the airport because he's hypnotized by the baggage carousels, and that Jerry, opining on how to identify a virgin, said "It's not like spotting a toupee." Because these characters and events spring from the imagination of *Seinfeld's* authors, *The SAT* plainly copies copyrightable, creative expression.[5] *See Feist*, 499 U.S. at 347, 111 S.Ct. 1282 (discussing distinction between discovered facts, which do not "owe their origin to an act of authorship" and therefore are not protected by copyright, and created facts, which constitute original, protected expression).

We find support for this conclusion in a previous case in which we held that a series of still photographs of a ballet may in some cases infringe the copyright in an original choreographic work. *See Horgan v. Macmillan, Inc.*, 789 F.2d 157, 163 (2d Cir.1986). The defendants in *Horgan* claimed that still photographs could not "capture the flow of movement, which is the essence of dance," that "the staged performance could not be recreated from the photographs," and thus, that the photographs were not substantially similar to the choreographic work. *Id.* at 161–62 (quotation marks omitted). Although noting that the issue "was not a simple one,"

this court rejected that argument, holding that "the standard for determining copyright infringement is not whether the original could be recreated from the allegedly infringing copy, but whether the latter is substantially similar to the former." *Id.* at 162 (quotation marks omitted). That observation applies with equal force to the trivia quiz fragments in this case. Although *Seinfeld* could not be "recreated" from *The SAT*, Castle Rock has nevertheless established both the quantitative and qualitative components of the substantial similarity test, establishing a *prima facie* case of copyright infringement.

### B. *Other Tests*

As defendants note, substantial similarity usually "arises out of a claim of infringement as between comparable works .... [where] because of the equivalent nature of the competing works, the question of similarity can be tested conventionally by comparing comparable elements of the two works." Because in the instant case the original and secondary works are of different genres and to a lesser extent because they are in different media, tests for substantial similarity other than the quantitative/qualitative approach are not particularly helpful to our analysis.

■ Under the "ordinary observer" test, for example, "[t]wo works are substantially similar where 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal [of the two works] as the same.'" *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir.1992) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960) (L.Hand, J.) (comparing dress designs)) (alterations in original). Undoubtedly, Judge Hand did not have in mind a comparison of aesthetic appeal as between a television series and a trivia quiz and, in the usual case, we might

---

**5.** We appreciate that the line between unprotected fact and protected creative expression may in some instances be less clear. Where a "fictional" single mother in a popular television series engages in real political discourse with a real Vice–President of the United States, for example, it is less clear whether the television "script" is

fiction—in the sense that it is only a television script, or fact—in the sense that it is a real dialogue with a real political figure about contemporary issues. Whatever the line between historical fact and creative expression, however, *Seinfeld* is securely on the side of creative expression.

question whether any "ordinary observer" would "regard [the] aesthetic appeal" in ·a situation-comedy television program as being· identical to that of any book, let alone a trivia quiz book, about that program. *Cf. Laureyssens*, 964 F.2d at 132, 141 (applying "ordinary observer" test to compare two sets of foam rubber puzzles). We note here, however, that plaintiff has a plausible claim that there is a common aesthetic appeal between the two works based on *The SAT*'s plain copying of *Seinfeld* and Golub's statement on the back cover that the book was designed to complement the aesthetic appeal of the television series. *See The SAT* ("So twist open a Snapple, double-dip a chip, and open this book to satisfy your between episode cravings.").

Under the "total concept and feel" test, urged by defendants, we analyze "the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting" of the original and the allegedly infringing works. *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir.1996) (comparing children's books with novel and movie); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.1976) (comparing children's book with story in *Sesame Street Magazine*). Defendants contend that *The SAT* and the *Seinfeld* programs are incomparable in conventional terms such as plot, sequence, themes, pace, and setting. For example, *The SAT* has no plot; "[t]he notion of pace ... cannot be said even to exist in the book"; *The SAT*'s "sequence has no relationship to the sequences of any of the *Seinfeld* episodes, since it is a totally random and scattered collection of questions relating to events that occurred in the shows"; and *The SAT*'s only theme "is how much a *Seinfeld* fan can remember of 84 different programs." The total concept and feel test, however, is simply not helpful in analyzing works that, because of their different genres and media, must necessarily have a different concept and feel. Indeed, many "derivative" works of different genres, in which copyright owners have exclusive rights, *see* 17 U.S.C.

§ 106, may have a different total concept and feel from the original work.

Finally, we do not apply the "fragmented literal similarity" test,[6] which focuses upon copying of direct quotations or close paraphrasing, or the "comprehensive nonliteral similarity" test, which examines whether "the fundamental essence or structure of one work is duplicated in another." 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[A][1], at 13–29, § 13.03[A][2], at 13–45 (1997) (hereafter "Nimmer"); *Twin Peaks*, 996 F.2d at 1372–73(applying Nimmer test); *Warner Bros. Inc. v. American Broad. Cos.*, 720 F.2d 231, 240, 242 (2d Cir.1983) (applying Nimmer test to compare *Superman* and *The Greatest American Hero*). In the instant case, because the direct quotations or close paraphrases that *The SAT* copied from the *Seinfeld* series are few and almost irrelevant to *The SAT*, undue focus upon these isolated quotations ·could improperly distract us from inquiring as to whether substantial similarity exists between *Seinfeld* and *The SAT*.

Castle Rock's comprehensive nonliteral similarity argument—that the defendants "literally constructed the SAT with 643 fragments of *Seinfeld*'s creative whole"—is also unhelpful to our analysis and unnecessary to our determination that *The SAT* is substantially similar to *Seinfeld*. Without having viewed *Seinfeld* itself, no *SAT* reader could plausibly "construct" in his or her mind the plot of any *Seinfeld* episode, nor any of *Seinfeld*'s settings (the Seinfeld and Kramer apartments, the foursome's restaurant hangout, George Steinbrenner's office, etc.), nor even the four principal *Seinfeld* characters. Nor does *The SAT* "[duplicate] the fundamental essence or structure" of *Seinfeld*. 4 Nimmer § 13.03[A][1], at 13–29; *cf. Twin Peaks*, 996 F.2d 1372–73 (finding "substantial similarity through comprehensive nonliteral similarity" where chapter of infringing book "is essentially a detailed recounting of the first eight episodes of the [television] series" and "[e]very intricate plot twist and element of character development appear in the Book

---

**6.** We do not understand *Ringgold*'s quantitative analysis to be the same as a fragmented similarity analysis. The former considers the amount of

copying not only of direct quotations and close paraphrasing, but also of all other protectable expression in the original work.

in the same sequence as in the teleplays"). However, "[t]he standard for determining copyright infringement is not whether the original could be recreated from the allegedly infringing copy, but whether the latter is 'substantially similar' to the former," *Horgan*, 789 F.2d at 162, and in copying a sufficient amount of protected expression from the *Seinfeld* television series, *The SAT* easily passes the threshold of substantial similarity between the contents of the secondary work and the protected expression in the original.

### III. *Fair Use*

 Defendants claim that, even if *The SAT*'s copying of *Seinfeld* constitutes *prima facie* infringement, *The SAT* is nevertheless a fair use of *Seinfeld.* "From the infancy of copyright protection," the fair use doctrine "has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting U.S. Const., art. I, § 8, cl. 8). As noted in *Campbell*, "in truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before." *Id.* (quotation marks omitted). Until the 1976 Copyright Act, the doctrine of fair use grew exclusively out of the common law. *See id.* at 576, 114 S.Ct. 1164; *Folsom v. Marsh,* 9 F.Cas. 342, 348 (C.D.Mass.1900) (CCD Mass. 1841) (Story, J.) (stating fair use test); Pierre N. Leval, *Toward a Fair Use Standard,* 103 Harv. L.Rev. 1105, 1105 (1990) ("Leval").

 In the Copyright Act, Congress restated the common law tradition of fair use:

> [T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. This section "intended that courts continue the common law tradition of fair use adjudication" and "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell,* 510 U.S. at 577, 114 S.Ct. 1164 (quotation marks omitted). Fair use analysis, therefore, always "calls for case-by-case analysis." *Id.* The fair use examples provided in § 107 are "illustrative and not limitative" and "provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses." *Id.* at 577–78, 114 S.Ct. 1164. Similarly, the four listed statutory factors in § 107 guide but do not control our fair use analysis and "are to be explored, and the results weighed together, in light of the purposes of copyright." *Id.; see* 4 Nimmer § 13.05[A], at 13–153 ("[T]he factors contained in Section 107 are merely by way of example, and are not an exhaustive enumeration."). The ultimate test of fair use, therefore, is whether the copyright law's goal of "promot[ing] the Progress of Science and useful Arts," U.S. Const., art. I, § 8, cl. 8, "would be better served by allowing the use than by preventing it." *Arica,* 970 F.2d at 1077.

### A. *Purpose/Character of Use*

The first fair use factor to consider is "the purpose and character of the [allegedly infringing] use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). That *The SAT*'s use is commercial, at most, "tends to weigh against a finding of fair use."

*Campbell,* 510 U.S. at 585, 114 S.Ct. 1164 (quotation marks omitted); *Texaco,* 60 F.3d at 921. But we do not make too much of this point. As noted in *Campbell,* "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research ... are generally conducted for profit in this country," 510 U.S. at 584, 114 S.Ct. 1164 (quotation marks omitted), and "no man but a blockhead ever wrote, except for money," *id.* (quoting 3 Boswell's Life of Johnson 19 (G. Hill ed.1934)). We therefore do not give much weight to the fact that the secondary use was for commercial gain.

■■■ The more critical inquiry under the first factor and in fair use analysis generally is whether the allegedly infringing work "merely supersedes" the original work "or instead adds something new, with a further purpose or different character, altering the first with new ... meaning [ ] or message," in other words "whether and to what extent the new work is 'transformative.' " *Id.* at 579, 114 S.Ct. 1164 (quoting Leval at 1111). If "the secondary use adds value to the original—if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." Leval at 1111. In short, "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164.

■■■ Defendants claim two primary "transformative" qualities of *The SAT.* First, as noted by the district court, "a text testing one's knowledge of Joyce's *Ulysses,* or Shakespeare's *Hamlet,* would qualify as 'criticism, comment, scholarship, or research,' or such. The same must be said, then, of a text testing one's knowledge of Castle Rock's *Seinfeld." Castle Rock,* 955 F.Supp. at 268 (citing *Twin Peaks,* 996 F.2d at 1374 ("A comment is as eligible for fair use protection when it concerns 'Masterpiece Theater' and appears in the New York Review of Books as when it concerns 'As the World Turns' and

appears in Soap Opera Digest.")). In other words, the fact that the subject matter of the quiz is plebeian, banal, or ordinary stuff does not alter the fair use analysis. Criticism, comment, scholarship, research, and other potential fair uses are no less protectable because their subject is the ordinary.

Second, defendants style *The SAT* as a work "decod[ing] the obsession with ... and mystique that surround[s] 'Seinfeld,' " by "critically restructur[ing] [*Seinfeld*'s mystique] into a system complete with varying levels of 'mastery' that relate the reader's control of the show's trivia to knowledge of and identification with their hero, Jerry Seinfeld." Citing one of their own experts for the proposition that "[t]he television environment cannot speak for itself but must be spoken for and about," defendants argue that "*The SAT* is a quintessential example of critical text of the TV environment .... expos[ing] all of the show's nothingness to articulate its true motive forces and its social and moral dimensions." (Quotation marks omitted). Castle Rock dismisses these arguments as post hoc rationalizations, claiming that had defendants been half as creative in creating *The SAT* as were their lawyers in crafting these arguments about transformation, defendants might have a colorable fair use claim.

Any transformative purpose possessed by *The SAT* is slight to non-existent. We reject the argument that *The SAT* was created to educate *Seinfeld* viewers or to criticize, "expose," or otherwise comment upon *Seinfeld. The SAT*'s purpose, as evidenced definitively by the statements of the book's creators and by the book itself, is to repackage *Seinfeld* to entertain *Seinfeld* viewers. *The SAT*'s back cover makes no mention of exposing *Seinfeld* to its readers, for example, as a pitiably vacuous reflection of a puerile and pervasive television culture, but rather urges *SAT* readers to "open this book to satisfy [their] between-episode [*Seinfeld*] cravings." Golub, *The SAT*'s author, described the trivia quiz book not as a commentary or a *Seinfeld* research tool, but as an effort to "capture Seinfeld's flavor in quiz book fashion." Finally, even viewing *The SAT* in the light most favorable to defendants, we find scant

reason to conclude that this trivia quiz book seeks to educate, criticize, parody, comment, report upon, or research *Seinfeld*, or otherwise serve a transformative purpose.[7] The book does not contain commentary or analysis about *Seinfeld*, nor does it suggest how *The SAT* can be used to research *Seinfeld*; rather, the book simply poses trivia questions. *The SAT*'s plain purpose, therefore, is not to expose *Seinfeld*'s "nothingness," but to satiate *Seinfeld* fans' passion for the "nothingness" that *Seinfeld* has elevated into the realm of protectable creative expression.

Although a secondary work need not necessarily transform the original work's expression to have a transformative purpose, *see, e.g.,* 4 Nimmer § 13.05[D][2], at 13–227– 13–228 (discussing reproduction of entire works in judicial proceedings), the fact that *The SAT* so minimally alters *Seinfeld*'s original expression in this case is further evidence of *The SAT*'s lack of transformative purpose. To be sure, the act of testing trivia about a creative work, in question and answer form, involves some creative expression. While still minimal, it does require posing the questions and hiding the correct answer among three or four incorrect ones.[8] Also, dividing the trivia questions into increasing levels of difficulty is somewhat more original than arranging names in a telephone book in alphabetical order. *See Feist,* 499 U.S. at 362–63, 111 S.Ct. 1282. *The SAT*'s incorrect multiple choice answers are also original. However, the work as a whole, drawn directly from the *Seinfeld* episodes without substantial alteration, is far less transformative than other works we have held not to constitute fair use. *See, e.g., Twin Peaks,* 996 F.2d at 1378 (book about *Twin Peaks* television series that discusses show's popularity, characters, actors, plots, creator, music, and poses trivia questions about show held not to be fair use).

■ Finally, we note a potential source of confusion in our copyright jurisprudence over the use of the term "transformative." A "derivative work," over which a copyright owner has exclusive control, is defined as

a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, *transformed,* or adapted.

17 U.S.C. §§ 101, 106(2) (emphasis added). Although derivative works that are subject to the author's copyright transform an original work into a new mode of presentation, such works—unlike works of fair use—take expression for purposes that are not "transformative."[9] In the instant case, since *The SAT* has transformed *Seinfeld*'s expression into trivia quiz book form with little, if any, transformative purpose, the first fair use factor weighs against defendants.

### B. *Nature of the Copyrighted Work*

The second statutory factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. Defendants concede that the scope of fair use is somewhat narrower with respect to fictional works, such as *Seinfeld,* than to factual works. *See Stewart v. Abend,* 495 U.S. 207, 237, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) ("In general, fair use is more

---

7. Had *The SAT*'s incorrect answer choices attempted to parody *Seinfeld*, for example, defendants would have a stronger case for fair use. *See Campbell,* 510 U.S. at 588, 114 S.Ct. 1164.

8. In the time it took to write this last sentence, for example, one could have easily created the following trivia question about the film trilogy *Star Wars:* "Luke Skywalker was aghast to learn that Darth Vader was Luke's (a) father (b) father-in-law (c) best friend (d) Jerry Seinfeld," and innumerable other such trivia questions about original creative works.

9. Indeed, if the secondary work sufficiently transforms the expression of the original work such that the two works cease to be substantially similar, then the secondary work is not a derivative work and, for that matter, does not infringe the copyright of the original work. *See* 1 Nimmer § 3.01, at 3–3 (stating that "a work will be considered a derivative work only if it would be considered an infringing work" if it were unauthorized).

likely to be found in factual works than in fictional works"); *Twin Peaks,* 996 F.2d at 1376 (second factor "favor[s] . . . creative and fictional work"). Although this factor may be of less (or even of no) importance when assessed in the context of certain transformative uses, *see, e.g., Campbell,* 510 U.S. at 586, 114 S.Ct. 1164 (creative nature of original "Pretty Woman" song "not much help" to fair use analysis "since parodies almost invariably copy . . . expressive works"), the fictional nature of the copyrighted work remains significant in the instant case, where the secondary use is at best minimally transformative. Thus, the second statutory factor favors the plaintiff.

### C. Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

 As a preliminary matter, the district court held that its determination that *The SAT* is substantially similar to *Seinfeld* " 'should suffice for a determination that the third fair use factor favors the plaintiff.' " *Castle Rock,* 955 F.Supp. at 269–70 (quoting *Twin Peaks,* 996 F.2d at 1377). However, because secondary users need invoke the fair use defense *only* where there is substantial similarity between the original and allegedly infringing works, and thus actionable copying, the district court's analysis is of little if any assistance. Under the district court's analysis, the third fair use factor would always and unfairly favor the original copyright owner claiming no fair use. *See* 4 Nimmer § 13.05[A], at 13–152 ("[F]air use is a defense not because of the absence of substantial similarity but rather despite the fact that the similarity is substantial.").

In *Campbell,* a decision post-dating *Twin Peaks,* the Supreme Court clarified that the third factor—the amount and substantiality of the portion of the copyrighted work used—must be examined in context. The inquiry must focus upon whether "[t]he extent of . . . copying" is consistent with or more than necessary to further "the purpose and character of the use." 510 U.S. at 586–87, 114 S.Ct. 1164; *see Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 449–50, 104 S.Ct. 774, 78 L.Ed.2d 574

(1984) (reproduction of entire work "does not have its ordinary effect of militating against a finding of fair use" as to home videotaping of television programs); *Harper & Row,* 471 U.S. at 564, 105 S.Ct. 2218 ("[E]ven substantial quotations might qualify as fair use in a review of a published work or a news account of a speech" but not in a scoop of a soon-to-be-published memoir.). "[B]y focussing [sic] on the amount and substantiality of the original work used by the secondary user, we gain insight into the purpose and character of the use as we consider whether the quantity of the material used was reasonable in relation to the purpose of the copying." *Texaco,* 60 F.3d at 926 (quotation marks omitted). In *Campbell,* for example, the Supreme Court determined that a "parody must be able to 'conjure up' at least enough of [the] original [work] to make the object of its critical wit recognizable" and then determined whether the amount used of the original work was "no more than necessary" to satisfy the purpose of parody. 510 U.S. at 588–89, 114 S.Ct. 1164.

In the instant case, it could be argued that *The SAT* could not expose *Seinfeld* 's "nothingness" without repeated, indeed exhaustive examples deconstructing *Seinfeld* 's humor, thereby emphasizing *Seinfeld* 's meaninglessness to *The SAT* 's readers. That *The SAT* posed as many as 643 trivia questions to make this rather straightforward point, however, suggests that *The SAT* 's purpose was entertainment, not commentary. Such an argument has not been advanced on appeal, but if it had been, it would not disturb our conclusion that, under any fair reading, *The SAT* does not serve a critical or otherwise transformative purpose. Accordingly, the third factor weighs against fair use.

### D. Effect of Use Upon Potential Market for or Value of Copyrighted Work

Defendants claim that the fourth factor favors their case for fair use because Castle Rock has offered no proof of actual market harm to *Seinfeld* caused by *The SAT.* To the contrary, *Seinfeld* 's audience grew after publication of *The SAT,* and Castle Rock has evidenced no interest in publishing *Seinfeld*

trivia quiz books and only minimal interest in publishing *Seinfeld*-related books.

 The Supreme Court has recently retreated from its earlier cases suggesting that the fourth statutory factor is the most important element of fair use, *see Harper & Row*, 471 U.S. at 566, 105 S.Ct. 2218, recognizing instead that "[a]ll [factors] are to be explored, and the results weighed together, in light of the purposes of copyright," *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164; *see Texaco*, 60 F.3d at 926 (applying *Campbell* approach). Under this factor, we "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 (quotation marks and citation omitted). The fourth factor must also "take account ... of harm to the market for derivative works," *id.*, defined as those markets "that creators of original works would in general develop or license others to develop," *id.* at 592, 114 S.Ct. 1164.

In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps or substitutes for the market of the original work. *Id.* at 593, 114 S.Ct. 1164. The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original. *Id.* at 591, 114 S.Ct. 1164. As noted by the district court, "[b]y the very nature of [transformative] endeavors, per-

sons other than the copyright holder are undoubtedly better equipped, and more likely, to fill these particular market and intellectual niches." *Castle Rock*, 955 F.Supp. at 271. And yet the fair use, being transformative, might well harm, or even destroy, the market for the original. *See Campbell*, 510 U.S. at 591–92, 114 S.Ct. 1164 ("[A] lethal parody, like a scathing theater review, kills demand for the original, [but] does not produce a harm cognizable under the Copyright Act."); *New Era Publications*, 904 F.2d at 160 ("a critical biography serves a different function than does an authorized, favorable biography, and thus injury to the potential market for the favorable biography by the publication of the unfavorable biography does not affect application of factor four").[10]

Unlike parody, criticism, scholarship, news reporting, or other transformative uses, *The SAT* substitutes for a derivative market that a television program copyright owner such as Castle Rock "would in general develop or license others to develop." *Campbell*, 510 U.S. at 592, 114 S.Ct. 1164.[11] Because *The SAT* borrows exclusively from *Seinfeld* and not from any other television or entertainment programs, *The SAT* is likely to fill a market niche that Castle Rock would in general develop. Moreover, as noted by the district court, this "*Seinfeld* trivia game is not critical of the program, nor does it parody the program; if anything, *SAT* pays homage to *Seinfeld*." *Castle Rock*, 955 F.Supp. at 271–72. Although Castle Rock has evidenced little if any interest in exploiting this market for derivative works based on *Seinfeld*, such as by creating and publishing *Seinfeld* trivia books (or at least trivia books that endeavor to "satisfy" the "between-episode

---

10. By the same token, because a "film producer's appropriation of a composer's previously unknown song that turns the song into a commercial success" is a market substitute, that use is not made fair because it *increases* the market for the original work. *Campbell*, 510 U.S. at 591 n. 21, 114 S.Ct. 1164.

11. Just as secondary users may not exploit markets that original copyright owners would "in general develop or license others to develop" even if those owners had not actually done so, copyright owners may not preempt exploitation of transformative markets, which they would not "*in general* develop or license others to develop," by actually developing or licensing others to de-

velop those markets. Thus, by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work, a copyright owner plainly cannot prevent others from entering those fair use markets. *See* 4 Nimmer § 13.05[A][4], at 13–181–13–182 (recognizing "danger of circularity" where original copyright owner redefines "potential market" by developing or licensing others to develop that market); *Texaco*, 60 F.3d at 930 ("Only an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets" is relevant to fourth factor.).

cravings" of *Seinfeld* lovers), the copyright law must respect that creative and economic choice. "It would ... not serve the ends of the Copyright Act—*i.e.,* to advance the arts—if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." *Castle Rock,* 955 F.Supp. at 272; *see Salinger,* 811 F.2d at 99 ("The need to assess the effect on the market for Salinger's letters is not lessened by the fact that their author has disavowed any intention to publish them during his lifetime."). The fourth statutory factor therefore favors Castle Rock.

### E. *Other Factors*

■ As we have noted, the four statutory fair use factors are non-exclusive and serve only as a guide to promote the purposes underlying the copyright law. One factor that is of no relevance to the fair use equation, however, is defendants' continued distribution of *The SAT* after Castle Rock notified defendants of its copyright infringement claim, because "[i]f the use is otherwise fair, then no permission need be sought or granted.... [B]eing denied permission to use a work does not weigh against a finding of fair use." *Campbell,* 510 U.S. at 585 n. 18, 114 S.Ct. 1164; *see Wright,* 953 F.2d at 737 (rejecting as irrelevant to fair use analysis argument that defendant failed to get plaintiff's permission to create work).

We also note that free speech and public interest considerations are of little relevance in this case, which concerns garden-variety infringement of creative fictional works. *See* 4 Nimmer § 13.05[B][4], at 13–205 ("The public interest is also a factor that continually informs the fair use analysis."); *cf. Time Inc. v. Bernard Geis Assocs.,* 293 F.Supp. 130, 146 (S.D.N.Y.1968) (discussing importance of access to information about President Kennedy assassination in fair use analysis of home video of assassination).

### F. *Aggregate Assessment*

Considering all of the factors discussed above, we conclude that the copyright law's objective "[t]o promote the Progress of Science and useful Arts" would be undermined by permitting *The SAT*'s copying of *Seinfeld, see Arica,* 970 F.2d at 1077, and we therefore reject defendants' fair use defense. Finally, we note that defendants do not assert that Castle Rock abandoned, forfeited, or misused copyrights in *Seinfeld,* and that defendants have asserted no defense on appeal other than that of fair use.

### *Conclusion*

Undoubtedly, innumerable books could "expose" the "nothingness" or otherwise comment upon, criticize, educate the public about, or research *Seinfeld* and contemporary television culture. *The SAT,* however, is not such a book. For the reasons set forth above, the judgment of the district court is affirmed.[12]

---

**12.** For any reader of this opinion still possessed by post-*Seinfeld* "cravings," the answers to the trivia questions posed *supra,* at 3–4 & n. 2, are:

1–c, 11–"Junior Mints," 12–a; matching: 1–f, 2–c, 3–i, 4–d, 5–a, 6–h, 7–e, 8–g, 9–j, 10–b.