Christina STAROBIN, Plaintiff,

v.

Stephen KING and Penguin Putnam, Inc., Defendants.

No. 00–CV–0185.

United States District Court, N.D. New York.

April 17, 2001.

Christina Starobin, Saugerties, NY, for Plaintiff, pro se.

Frankfurt, Garbus, Kurnit, Klein & Selz, P.C., for Defendants, New York, NY, Gerald E. Singleton, Maura J. Wogan, Yuki A. Hirose, of counsel.

Lankler Siffert & Wohl LLP, Co–Counsel for Defendant Stephen King, New York, NY, Peter A. Herbert, of counsel.

## MEMORANDUM—DECISION AND ORDER

HURD, District Judge.

### I. INTRODUCTION

On January 31, 2000, plaintiff Christina Starobin ("Starobin" or "plaintiff") commenced the instant action against defendants Stephen King ("King") and Penguin Putnam, Inc. ("Penguin") (collectively "defendants")[1] for copyright infringement pursuant to 17 U.S.C. § 101. Defendants now move for summary judgment on all

---

1. The complaint also incorrectly named as defendants "Viking Publishing," "Dutton Signet," "Signet," and "Penguin Audiobooks."

claims against them, pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposes.

## II. FACTS

This action arises out of the alleged infringement of plaintiff's copyright for her unpublished manuscript *Blood Eternal* by defendants in the publication of King's novel *Desperation.* The following are the facts stated in the light most favorable to the non-moving plaintiff.

Starobin is a poet, author, and assistant adjunct professor of literature at Ulster County Community College in Stone Ridge, New York. King is a somewhat well-known author of novels and screenplays. On November 27, 1995, Starobin obtained a copyright from the United States Copyright Office for her manuscript.

In December of 1995, Starobin met Julia Moskin ("Moskin"), an editor for defendant Penguin, at a literary convention. Starobin told Moskin about her recently-copyrighted manuscript. Moskin asked plaintiff to send her the manuscript at Penguin. On January 1, 1996, Starobin sent the manuscript for *Blood Eternal* to Moskin. On March 21, 1996, Moskin faxed plaintiff a letter suggesting that Starobin make certain changes to the manuscript and then send the revised book to Joe Pittman ("Pittman"), another editor at Penguin, because Moskin was leaving Penguin to write a book of her own. Starobin sent the revised version of *Blood Eternal* to Pittman on June 10, 1996.

Plaintiff unsuccessfully inquired as to the status of her book in July and August of 1996. In September 1996, she called Penguin to request the return of her manuscript. Penguin is also the publisher of King's fiction. King's novel, *Desperation,* was copyrighted on September 18, 1996. Plaintiff's manuscript was returned to her on September 20, 1996.[2]

## III. STANDARD OF REVIEW

### A. Summary Judgment

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hawkins v. Steingut,* 829 F.2d 317, 319 (2d Cir.1987). Nevertheless, "the litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Pro se litigants are permitted "special latitude in responding to a summary judgment motion." *Shepherd v.*

---

**2.** This coincidence in timing is relevant to the question of King's access to plaintiff's unpublished manuscript; however, because such access is presumed for purposes of this decision, *see, infra* at note 5, it is of little significance to the instant motion.

*Fraisher,* 1999 WL 713839, at *2 (S.D.N.Y. 1999) (citing *Gonzalez v. Long,* 889 F.Supp. 639, 642 (E.D.N.Y.1995)).

## B. *Copyright Infringement*

 To succeed on a claim of copyright infringement, two elements must be proven: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). This second element may be established through either direct evidence of copying or by inference. Copying may be inferred where a plaintiff establishes that (1) defendant had access to the copyrighted work, and (2) there is a substantial similarity of expression in the respective works. *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998).[3] The test for "substantial similarity" is " 'whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.' " *Warner Bros. Inc. v. American Broadcasting Companies,* 654 F.2d 204, 208 (2d Cir.1981) (quoting *Ideal Toy v. Fab–Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir.1966)).

## IV. *DISCUSSION*

 Defendants' motion for summary judgment must be granted. Upon a review of both plaintiff's unpublished manuscript and King's novel,[4] as well as the multitude of exhibits submitted by plaintiff in support of her position, it is clear *beyond any possible reasonable dispute* that there has been no copying of plaintiff's manuscript in this case. Other than the occasional common word or stock element, there is absolutely no similarity between the two works. Moreover, plaintiff's efforts to manufacture a question of fact as to whether or not portions of *Desperation* have been plagiarized from her manuscript serve only to highlight the complete absence of any reasonable issues for trial in this case.[5]

Plaintiff begins her case in a difficult position. She has written a novel about vampires who operate a car service in the suburbs of New Jersey. King has written a novel about an ancient evil spirit released from a mine in the Nevada desert. There are no common characters, locations, or occurrences shared by her novel and King's. There are no common references to popular culture, historical events, or common sequences of events.[6] Never-

3. Because there is no direct evidence of copying in this case (such as, for example, evidence of portions of plaintiff's unpublished manuscript being imported directly into King's novel), consideration of Starobin's claims is limited to the issue of whether she has sufficient credible evidence to create a question of fact as to the inference of copying.

4. Both the plaintiff's unpublished manuscript and King's novel were read "cover to cover." This reading of a work by King was a first. Also, no other work of the plaintiff had ever been read. Quite frankly, neither work was a particularly good read.

5. Plaintiff's argument in her memorandum of law focuses almost exclusively on the question of access to her work by King, and baldly

asserting that the question of "substantial similarity" is a question for a jury. (Pl. Mem. at 36.). Because the absence of any similarity between the two works is indisputable, it is not necessary to decide the question of King's access to plaintiff's manuscript and such access will be assumed for purposes of this decision.

6. Very often, in cases addressing the substantial similarity of artistic works, it is necessary to describe in detail the plot, characters, and scenes contained in the two works, in order to adequately consider any alleged similarities. Because there are no similarities between the works at issue, no such painful and time-consuming task of that nature has been undertaken.

theless, plaintiff asserts that despite the overwhelming dissimilarity between the plots, characters, and settings of the two works, a careful review of the novels reveals a telling pattern of plagiarism.

According to plaintiff, this alleged plagiarism consists of "King or his copyists" at Penguin seeking "to stay within the letter of the law while pilfering the heart and soul of plaintiff's original creation." (*See* Plaintiff's Memorandum of Points and Authorities In Opposition To Motion For Summary Judgment at 6 [hereinafter, "Pl. Mem. at ——".].) She alleges that "[d]efendants copied plaintiff's work, painstakingly paraphrasing with the intention to evade, evincing considerable skill and knowledge of just how far they might be required to change plaintiff's work and still 'get away with it.'" (Pl. Mem. at 21.) This argument, though interesting, is entirely unsupported by the record.

In support of these claims, Starobin has prepared voluminous exhibits purporting to demonstrate instances of plagiarism by King (or, as she repeatedly states, "whomever wrote or produced the work attributed to King") (Pl. Mem. at 3.). One exhibit consists of a 16 page comparison of "correspondences" between the two works.

(Starobin Aff. Exh. K.) These "correspondences," which plaintiff claims are demonstrative of the "literary rape" (Pl. Mem. at 35) of her work, consist of such telling similarities as:

— hearing footsteps on gravel (*Blood Eternal*), and hearing footsteps on black tar (*Desperation*) (Exh. K at 2); [7]

— driver talks on walkie-talkie (*Blood Eternal*), and author talks on cellular phone (*Desperation*) (Exh. K at 2);

— tooth pulp like undigested meat (*Blood Eternal*), and raw tissue from mouth and nose like raw meat (*Desperation*) (Exh. K at 3); and

— gull with blood drained out (*Blood Eternal*), and dog devoured by buzzards (*Desperation*) (Exh. K at 5).

In other exhibits, plaintiff identifies isolated words that appear in both works. For example, she notes that the word "zilch" appears in both her unpublished manuscript and the final published version of *Desperation*.[8] (Exh. B at 10.) She also relies on the fact that the word "protected" appears in both works, suggesting that "King and his copyists" have stolen "key ideas or themes" from her work.[9] (Exh. B at 9.)

7. The actual language plaintiff is identifying in this example is as follows:
*Desperation:* "Their footfalls on the fresh black tar seemed very loud."
*Blood Eternal:* "Then she listened to her footsteps on the gravel as she walked back to the lighted bus shelter." (Exh. J at 2.)
It is clear that this "correspondence" relates, not to any particularized form of expression, but rather to the generalized notion of "hearing footsteps." Such a vague concept is not within the protection of copyright law. Plaintiff's other "correspondences" relate to similarly generalized ideas, as well as to isolated words.

8. Plaintiff notes that King changed the term "da nada" to the word "zilch" in the following quote, and claims that this change was occasioned by the use of that term in the passage from *Blood Eternal* quoted below:
*Desperation:* "On each of these occasions he had gotten up and gone immediately into the bathroom to check the toilet. Once there had been a used condom floating in there, so that was probably okay. On the other occasions, zilch." (Discussing the fear of contracting AIDS from unprotected sex.)
*Blood Eternal:* "It might even end up getting him popped and put away for good. This was definitely an undesirable result. OPERATION ZILCH was how he referred to it in his own mind."

9. For example, plaintiff makes much of the occurrence of the word "protected" in the following passages:

These examples, as well as the countless others identified by plaintiff in support of her claims, simply do not contain any evidence of plagiarism of any expression of an idea or fact which is protectible under copyright law. *See Rogers v. Koons,* 960 F.2d 301, 308 (2d Cir.1992) (examination of works for substantial similarity must focus "on the similarity of the expression of an idea or fact, not on the similarity of the facts, ideas, or concepts themselves."). Plaintiff's "correspondences" are insufficient as a matter of law to constitute a basis for a copyright action because it is well-settled that copyright protection "does not extend to ideas; it protects only the means of expression employed by the author." *CCC Information Svcs., Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61, 68 (2d Cir.1994). While it is true that numerous courts have observed that this is "a distinction easier to state than to apply," *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir.1986), it is clear that, without question, plaintiff has merely identified, if at all, ideas and concepts on the most attenuated level of generality and has failed to demonstrate any protectible expression common to both her work and to King's.

Moreover, it is wholly inappropriate to analyze the issue of "substantial similarity" through such "line-by-line analysis." *Littel v. Twentieth Century Fox Film Corp.,* 1995 WL 404939 at *17 n. 7 (S.D.N.Y. 1995). Comparing works of artistic expression, such as the novels at issue in this case, "by dissection neglects to pay proper attention to the works as a whole." *Id.* at *17 (citing *Walker,* 784 F.2d at 50). As noted above, when the two works at issue are viewed as a whole, it is utterly beyond dispute that no reasonable person could regard them as similar, much less substantially so.

As a final resort, plaintiff attempts to bolster her case by creating a dispute over King's literary qualifications. Plaintiff repeatedly argues that her literary credentials are superior to King's, and asserts that this alone creates an issue of fact as to whether or not King is capable of producing a work such as *Desperation.* The following quote is indicative of her arguments on this point:

> Although plaintiff's having graduated Harvard *cum laude,* gone on to a Masters in English and Comparative Literature at Colubmia [sic] and a PhD in English at New York University does not mean intelligence [sic], it does mean a long number of hours reading books other than Grisham and other best sellers and exposure to philosphy [sic], plot and symbolism in heavy enough doses to become queasy with the superficiality espoused by [defendant] King. (Pl. Mem. at 37.)

This disdain for the literary ability of King infects Starobin's moving papers, and constitutes a core component of her proof. (Pl. Mem. at 3, 6, 26, 37–38.) Repeatedly, she argues that because Stephen King is a writer of "debatable literary stature," (Pl. Mem. at 6) there is a question as to whether he could have produced the diverse body of work attributed to his authorship, and therefore, there is an issue of fact as to whether he produced the work at issue here—*Desperation*—or whether it is the product of skillful plagiarism.[10]

---

*Desperation:* "His legs were protected to some degree by the leather chaps and his head was protected by the motorcycle helmet ..."

*Blood Eternal:* " 'That protects them,' she thought. 'Even horses get protected.' " (referring to horses wearing blankets). (Exh. B at 5.)

**10.** She also states that "BLOOD ETERNAL,

On this point, Starobin must be admonished. She has engaged in a recurring and vitriolic attack upon the character and abilities of King.[11] She has repeatedly accused King (as well as anyone at Penguin who submitted an affidavit contradicting her allegations) of being a "liar," (Pl. Mem. at 5, 27) yet has failed to offer a single shred of evidence in support of her position. This conduct is reprehensible. It is wholly improper for her to engage in such character attacks without the slightest factual basis, and moreover, the relative literary merits of King's body of work is entirely irrelevant to the question of the similarity of the works at issue in this case. It is disheartening that a person of plaintiff's education and self-professed abilities would resort to such attacks, particularly in light of the obviously baseless nature of her claims.

## V. CONCLUSION

Because there is no similarity—substantial or otherwise—between the two works at issue in this case, defendants' motion for summary judgment must be granted. The plaintiff's remaining arguments have been considered and rejected. Therefore, it is hereby

ORDERED that

1. Defendant's motion for summary judgment is GRANTED; and

2. The complaint is DISMISSED.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

·which is the product of an Ivy League education, is not the work of an untutored hack." (Pl. Mem. at 26.) Plaintiff's unpublished manuscript for *Blood Eternal* contains the following simile: "she could feel the long teeth at the front of her mouth growing longer like tiny little car antennae looking for blood." Dr. Christina Starobin, *Blood Eternal* at 308 (unpublished manuscript).

11. For example, she argues that "we would be remiss, even foolhardy[,] to 'take his word for it' when he has shown such a propensity for telling lies," (Pl. Mem. at 40), and claims that King's diary entries should not be accepted as proof that his first draft of *Desperation* pre-dated her submission of *Blood Eternal* to Penguin because "we only have the word of defendant King, and defendant King is not notorious for his honesty." (Pl. Mem. at 27.)