**Stephen J. ARPAIA, Plaintiff,**

v.

**ANHEUSER–BUSCH COMPANIES, INC., D'Arcy Masius Benton & Bowles, Inc., DDB Needham Chicago, Inc., Defendants.**

**No. 98–CV–6007 CJS.**

United States District Court, W.D. New York.

March 25, 1999.

Lawrence L. Ginsburg, Lowenthal, Landau, Fischer & Bring, P.C., New York City, M. Norman Goldberger, Robert F. Zielinski, Wolf, Block, Schorr and Soliscohen LLP, Philadelphia, PA, for Stephen J. Arpaia, plaintiff.

Fred G. Aten, Jr., Rochester, NY, Jacques M. Rimokh, Richard & O'Neil, New York City, Barry Isaac Slotnick, Richards & O'Neil, New York City, Richard A. Palumbo, Boylan, Brown, Code, Fowler & Wilson, Rochester, NY, for Anheuser–Busch Companies, Inc., D'Arcy Masius Benton & Bowles, Inc., defendants.

Jacques M. Rimokh, Boylan, Brown, Code, Fowler & Wilson, Rochester, NY, Barry Isaac Slotnick, Richards & O'Neil, New York City, for DDB Needham Chicago, Inc., defendant.

### DECISION AND ORDER

SIRAGUSA, District Judge.

This is an action for copyright infringement, in which the plaintiff alleges that the defendants infringed scripts he wrote for Budweiser Beer television advertisements involving a character called the "Bud Frog." Now before the Court is the defendants' motion [# 16] for summary judgment. For the reasons that follow, this motion is granted.

### BACKGROUND

In 1990, the plaintiff wrote seven scripts intended as television advertisements for Budweiser Beer. Each of these advertisements contain a character referred to as "the Bud Frog." In one of these scripts, the Bud Frog makes a "BUD BUD" sound:

> We hear a FROG going "RRIBBET RRIBBETT ..." The woman looks over to where the sound is coming from. Sitting there is a frog.... The girl bends over to kiss the frog. As soon as she is about to kiss the frog, another frog, THE BUD FROG, jumps into the scene. THE BUD FROG is wearing a tuxedo shirt and a black tuxedo coat. He is wearing neon green mirrored sunglasses. THE BUD FROG is making a "BUD BUD" sound.

In the other six scripts, the Bud Frog is silent. In six of the scripts, the Bud Frog is wearing neon green mirrored sunglasses. In addition to the aforementioned tuxedo shirt and coat, the Bud Frog appears in some of the scripts wearing a captain's hat, a pink bathing suit, a hot pink tank top with neon green boxer shorts, a pharaoh's costume and a yellow construction hard hat. The seven scripts are summarized, in relevant part, below:

1) The Bud Frog makes the "BUD BUD" sound. A human female actress then kisses the Bud Frog, who turns into a can of Budweiser beer. The woman then exits with the can of beer, while the Bud Frog is "standing upright leaning on a tree with his legs crossed. He has a big smile on his face. He nods his head in approval."

2) Two men who are stranded on a deserted island send a message in bottle, asking for help. In response to this message, the Bud Frog arrives on the deserted island on an inner tube filled with cans and bottles of Budweiser beer. "The BUD FROG is sitting at the head of the inner tube. He is wearing a captain's hat along with his neon green mirrored sunglasses."

3) An astronaut is floating in space, attached to his spaceship by a safety cord, when a can of Budweiser beer floats by. Unable to reach the can of beer, the astronaut disconnects his safety cord

and grabs the beer, then floats away from his spaceship. "The BUD FROG is seen laying on a towel on the moon. He is wearing a pink bathing suit and his neon green mirrored sunglasses."

4) A man and a woman are sitting together outdoors on a blanket at night, watching the sky. The woman suggests that the man make a wish on a shooting star, which he does. In response to the man's wish, the woman then magically turns into a six-pack of Budweiser beer. "The BUD FROG is riding the shooting star like it is a horse. He is wearing a hot pink tank top with neon green boxer shorts. He looks down towards the beach, smiles and nods his head in approval."

5) Two men who are lost are wandering through the desert, with only a single can of Budweiser beer. The two agree to share the beer, but one of the men wishes that they had "just one more" can of beer. The men then magically find themselves "sitting on thrones in the middle of a beautiful oasis," when a beautiful woman approaches the two and serves them each a can of Budweiser. "Sitting down leaning at the foot of the throne is the BUD FROG. He is dressed in a pharaoh's costume. He is wearing his neon green mirrored sunglasses. He has a big smile on his face."

6) An architect's blueprint of a house comes to life. After the architect draws an attractive woman into the blueprint, she offers him a bottle of Budweiser beer. The architect then draws himself into the blueprint. "A gust of wind blows the blueprint out the window. CAMERA PANS LEFT. We see the BUD FROG standing behind a large fan. He is wearing a yellow construction hard hat. He is wearing his neon green mirrored sunglasses."

7) A man who is attending a meeting becomes bored and begins paging through a magazine, when he sees a picture of three women sunning themselves beside a swimming pool. The women in the picture then beckon to the man, and offer him a can of Budweiser. The man is then magically transported into the scene in the photograph. "CAMERA CLOSES IN on the cover [of the magazine]. On the cover of the magazine is the BUD FROG. He has on his neon green mirrored sunglasses. He has a big smile on his face."

The plaintiff submitted these scripts, unsolicited, to Anheuser–Busch ("A–B") in or about June of 1990.

At that time, A–B had a policy with respect to such unsolicited submissions. The submissions were to be forwarded to A–B's legal department, which would then return the submissions to their senders, along with a non-confidentiality agreement, which the senders were directed to sign and then return to A–B along with their submissions. At the same time, A–B's legal department would identify the particular A–B Brand Manager to whom the sender was to resubmit his or her submission. In order to identify such a particular Brand Manager, the legal department staff member would have to review the submission to determine its subject matter. Once the sender completed the non-confidentiality agreement and sent it and the submission back to the particular Brand Manager at A–B, the Brand Manager would respond to the sender with a letter. It was A–B's policy that once the particular Brand Manager responded to the sender, he was to send the submission, the non-confidentiality agreement, and a copy of his letter to A–B's legal department. Once these materials were returned to A–B's legal department, it was A–B's policy that only the legal department staff were to have access to them. Under this policy, advertising agencies working for A–B would have no direct access to unsolicited submissions. However, these agencies did work on various advertising projects with A–B employees who had access to such submissions before they were sent on to A–B's legal department.

When the plaintiff sent his scripts to A–B in June of 1990, he addressed the package containing his scripts to Mr. Robert Lachky, who was then the Senior Brand Manager for Bud Light. The plaintiff was then sent a non-confidentiality agreement, which he executed and returned to A–B. The non-confidentiality agreement provided, in pertinent part, that the plaintiff released "Anheuser–Busch from any and all liability as may arise by reason of its use of all or any portion [of the plaintiff's submission] except such liability as may arise by reason of valid patents now or hereafter issued or valid trademark or copyright registrations which [the plaintiff] now or hereafter may own." By letter dated July 12, 1990, Lachky wrote to the plaintiff and informed him that A–B had chosen not to pursue his idea "for a Bud Light commercial."[1] Lachky testified at his deposition that he never reviewed the unsolicited submissions that were sent to his office. Further, he stated that he had no recollection of ever having seen the plaintiff's scripts prior to the commencement of this lawsuit.

In 1994, A–B was represented by the defendant advertising agency, D'arcy Masius Benton & Bowles, Inc. ("D'arcy"). During the summer of 1994, August Busch IV, A–B's Vice President of Brand Management, told members of the D'arcy firm that he wanted them to create a television commercial for A–B that was similar to a commercial that he had seen for Diet Pepsi, in which an elephant swims up to a woman floating on a raft, takes her Diet Pepsi, and leaves a few peanuts on the raft. In order to create an advertisement that would be satisfactory to A–B, Smith's creative team at D'arcy was instructed to "free think" and to create the one television advertising spot that the team had "always wanted to do." At that time, Michael Smith was an Art Director on the A–B account at D'arcy's St. Louis office. Smith presented the idea of using a frog croaking "Bud" to his partner, who expanded on Smith's idea by adding two other frogs who croaked "weis" and "er," respectively.[2] According to Smith, he first thought of the idea for using a frog croaking "Bud" in a Budweiser beer commercial, in 1969 or 1970. As a child in rural Illinois, Smith noticed that the frogs around his home often sounded as if they were saying "Bud." The "Bud" sound was so distinct in one particular frog that Smith named the frog "Bud." Smith claims that he never saw the plaintiff's scripts prior to developing his idea for the Bud Frog, and that no one at A–B ever discussed with him the concept of using a frog in a Budweiser commercial.

D'arcy presented this idea to A–B in the summer of 1994 and received a favorable response. A–B then had D'arcy produce the initial "Bud Frog" commercial. A–B then ended its business relationship with D'arcy in November of 1994, and hired other advertising agencies, including the defendant DDB Needham Chicago, Inc. ("DDB"), to create subsequent Bud Frog commercials. The first Budweiser Frogs commercial aired on national television in January of 1995.

The twenty-two Budweiser Frog television commercials that A–B actually aired are summarized as follows:

a) The commercial opens with a large bull frog sitting on a rock in a swamp, croaking "Bud." The camera then shifts to two smaller frogs, one croaking "weis" and the other croaking "er." The frogs continue to make these sounds randomly, until eventually they each

---

1. Actually, the plaintiff's ideas were for Budweiser, not Bud Light.

2. In an attempt to discredit Smith's testimony, the plaintiff cites a newspaper article in which a Nashville Sound Producer, Tom Woodard, claimed that Smith had only asked him to produce a tape of one frog making the "Bud" sound, but that he had the idea for adding the two additional frogs saying "weis" and "er." However, these alleged statements made by Woodard are inadmissible hearsay not properly considered on a motion for summary judgment.

croak in sequence to for the word "Budweiser." The camera pans up, revealing a neon Budweiser sign above a bar.

b) The three frogs from the first commercial are sitting by the side of a road. As a large Budweiser delivery truck approaches, one of the frogs croaks "Bud," licks his lips, shoots out his tongue, and attaches himself to the rear of the truck, which continues to speed down the road, dragging the frog through the air behind it.

c) A bullfrog sits in the swamp, croaking the now-familiar "Bud" sound, when he hears a female voice croaking "weis" in the distance. The bullfrog then hops several times through the swamp toward the "weis" sound, until he discovers the frog who is croaking "weis" is an attractive female frog who winks at him. The bullfrog chuckles and grins at the camera.

d) As snow falls on a swamp and the bar, the viewer hears the muffled sounds of "Bud," "weis" and "er." The three shivering frogs are then shown on the deck of the bar, with their tongues frozen to a can of Budweiser.

e) The three frogs ride an alligator out of the swamp and into the bar. The sounds of a scream and breaking glass are heard, then the frogs croak "Bud," "weis" and "er." To the sounds of reggae music, the frogs then ride out of the bar on the alligator's back with a case of Budweiser tied onto the alligator.

f) The three frogs sit in the water, looking at a red Budweiser speed boat that is tied to a dock. The first two frogs croak "Bud" and "weis," and as the third frog croaks "er" he leaps into the boat, striking the boat's ignition button. As the first two frogs look on, the boat then takes off and speeds across the water with "er" frog screaming in exhilaration.

g) While the three frogs continue to croak "Bud," "weis" and "er" in the background, two lizards, Frankie and Louie, discuss the fact that they had also auditioned for the now-famous Budweis-er Frogs commercials. The smaller frog, Louie, complains about losing out to the frogs, and states "those frogs are gonna pay."

h) While the three frogs continue to croak "Bud," "weis" and "er" in the background, Louie tells Frankie that he would like to swim over and attack the frogs.

i) While the three frogs continue to croak "Bud," "weis" and "er" in the background, Louie yells insults at them, accidentally insulting Frankie's mother in the process.

j) While the three frogs continue to croak "Bud," "weis" and "er" in the background, Louie asks Frankie if it's true that frogs really taste like chicken. Noting that it is barbecue season, Louie then continues to suggest ways that he could cook the frogs.

k) While the three frogs continue to croak "Bud," "weis" and "er" in the background, Louie yells to the frogs that their days are numbered, and that he warns them that he knows a lot of predators, including the snakes and "some very large ferrets."

l) While the three frogs continue to croak "Bud," "weis" and "er" in the background, Frankie tells Louie that he is hearing rumors that Louie is going to "bump off the frogs."

m) While the three frogs continue to croak "Bud," "weis" and "er" in the background, Louie yells to the frogs that he hopes they enjoy the big [upcoming Superbowl] game, especially the first half, since they "may not be around" for the second half.

n) While the three frogs continue to croak "Bud," "weis" and "er" in the background, Louie tells Frankie that he plans to "assassinate" the frogs, then tries to cover up his slip by saying that he actually said he intends to "congratulate" them.

o) While the three frogs continue to croak "Bud," "weis" and "er" in the

background, Louie signals to a ferret with a ratchet wrench who is hiding behind the electric Budweiser sign above the bar. The sign then falls into the swamp, sending an electric shock through the water and silencing the frogs. Louie then tells Frankie that, "eventually, every frog has to ˙croak."

p) As Frankie and Louie survey the now smoldering swamp, Louie says that it is the best day of his life, until he again hears the frogs croaking the familiar "Bud," "weis" and "er." Louie bitterly concludes that one should "never hire a ferret to do a weasel's job."

q) Alone with the ferret, Louie berates him for not sticking to their "original plan."

r) Louie provides a public service announcement, stating that he does not endorse assassination attempts on frogs.

s) While the three frogs continue to croak "Bud," "weis" and "er" in the background, Louie tells Frankie that he is considering moving to another swamp, because he does not feel comfortable living in a swamp where assassination attempts are taking place.

t) While the three frogs continue to croak "Bud," "weis" and "er" in the background, Frankie tells Louie that he wants him to move to another tree branch, because he tried to "rub out the frogs."

u) Louie tells Frankie that Budweiser has chosen him to replace the "weis" frog, who is suffering from "post electro shock muscular irregularity."

v) As the two remaining frogs croak "Bud" and "er," Louie offers various interpretations of "weis," thereby earning a less than favorable review from Frankie.

The plaintiff registered his scripts with the United States Copyright Office on March 12, 1997. On January 7, 1998, the plaintiff commenced this action against A–B, D'arcy, and DDB. The complaint alleges causes of action for: 1) copyright infringe-ment; 2) breach of implied contract; 3) promissory estoppel; 4) unjust enrichment; and 5) misappropriation. He seeks damages, profits, permanent injunction and exemplary attorneys' fees.

Following discovery, the defendants moved for summary judgment on December 4, 1998. The defendants contend that they are entitled to summary judgment on several grounds. First, they contend that as a matter of law, their commercials are not substantially similar to the plaintiff's scripts. Second, they contend that the plaintiff cannot establish that the defendants actually copied his scripts. Third, they contend that the plaintiff's state-law claims are preempted. Fourth, they contend that even if they are not preempted, the plaintiff's state-law claims are barred by the non-confidentiality agreement between the plaintiff and A–B. Finally, they contend that in the alternative, the plaintiff's state-law claims fail on their merits.

The plaintiff, however, contends that there are material issues of fact which preclude summary judgment. First, on the issue of whether or not the defendants actually copied the plaintiff's scripts, the plaintiff contends that there is an issue of fact as to whether or not Robert Lachky ever reviewed unsolicited submissions generally, and whether or not he ever reviewed the plaintiff's submission in particular. At his deposition, Lachky testified that he never reviewed unsolicited submissions. (Lachky Dep., pp. 55–59). However, the plaintiff has produced copies of letters from Lachky to other persons who made unsolicited submissions, in which Lachky discusses the particular details of the submissions. For instance, in one letter, Lachky writes "[t]hanks for sending along the tap[e] of your Lab Retriever fetching Bud Lights! We appreciate his intelligence and good taste. Unfortunately we don't think this concept can be pursued as a television commercial for Bud Light, so we have to respectfully decline your offer." In another letter, Lachky writes "[t]hank you for submitting your music

and lyrics for a Budweiser commercial. We enjoyed listening to the tape and appreciate your kind words regarding Anheuser–Busch. I appreciate the time and effort you have devoted to your proposal, however, I regret to inform you that we have chosen not to pursue your idea." In another letter, Lachky writes "[t]hank you for writing us regarding your 'Male Bonding' idea for a Budweiser commercial. We appreciate hearing recommendations from our consumers. Unfortunately, Ms. Hilton, we have decided not to use your idea for our advertising campaign." In further support of his contention that Lachky reviewed his submissions, the plaintiff notes that Lachky's July 12, 1990 letter refers to an earlier submission by the plaintiff. Moreover, the plaintiff notes that Lachky's letter deviates from the form rejection letter produced by A–B in discovery. Finally, an employee of A–B's legal department, Kathy Ngo, testified at her deposition that once the Brand Managers received the resubmitted ideas and the executed non-confidentiality agreements, they were supposed to review the submissions before responding to the sender. (Ngo Dep., p. 17, 23).

The plaintiff also contends that there is an issue of fact as to whether or not Lachky personally kept a copy of the plaintiff's scripts after he sent the plaintiff his rejection letter dated July 12, 1990. As proof that Lachky may have kept a copy for himself, the plaintiff points out that while A–B claimed that it did not keep extra copies of such documents, in discovery A–B produced two different non-confidentiality agreements signed by the plaintiff and dated July 6, 1990, and two copies of Lachky's rejection letter to the plaintiff.[3]

The plaintiff also contends that there are issues of fact regarding the origin of Smiths's idea for the Budweiser Frogs commercial. At his deposition, Smith testified that when he was growing up, it sounded to him as if the frogs near his home were saying "Bud." Smith even testified that he had a pet frog named "Bud." However, Lachky testified that he had asked Smith "more than once" how he had come up with the idea, and Smith had told him that it sounded as if the frogs near his home were saying "Bud," "weis," and "er."(Lachky Dep. p. 36–37). Lachky also testified that Smith never mentioned having a pet frog. Moreover, Lachky testified that he had never met Smith before the presentation of the Bud frog idea in the Summer of 1994, while Smith testified that he had met with Lachky several times prior to that presentation. (Lachky Dep. p. 39; Smith Dep. p. 48). Finally, the plaintiff contends that in 1994, A–B's relationship with D'arcy was "crumbling" due to D'arcy's poor creative output, and that the resultant pressure on D'arcy to produce a successful commercial creates a triable issue of fact as to whether or not D'arcy then infringed the plaintiff's work.

## ANALYSIS

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing

---

**3.** In an attempt to further demonstrate that a question of fact exists as to whether or not the defendant advertising agencies had access to the plaintiff's scripts, the plaintiff states that Lachky "testified that he did not suggest ideas for television commercials," while Mr. Jackson of DDB contradicted this by testifying that "Lachky did suggest ideas for advertising campaigns." However, Jackson actually testi-

fied only that Lachky would "sometimes" "suggest ideas," although Jackson could not remember "anything specific." Moreover, Lachky testified only that he did not "introduce" ideas to advertising agencies, but he admitted that he helped to develop ideas once they were introduced by the ad agencies. (Lachky Dep. p. 11).

that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim. *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

## I. PLAINTIFF'S CLAIM OF COPYRIGHT INFRINGEMENT

The law in this Circuit pertaining to copyright infringement is well settled:

The Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. §§ 101–803, grants copyright owners a bundle of exclusive rights, including the rights to "reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work." *Id.* § 106. "Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir.1997); *see Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). *Castle Rock Entertainment, Inc. v. Carol Publ'g Group*, 150 F.3d 132, 137 (2d Cir. 1998). Thus, to establish a prima facie claim of copyright infringement, a plaintiff must establish two main elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc.*, 499 U.S. at 361, 111 S.Ct. 1282. On this motion for summary judgment, the defendants do not deny that the plaintiff owns a valid copyright. Accordingly, the determination of this motion will turn upon the question of whether or not the defendants copied original elements of the plaintiff's scripts.

In order to establish that the defendants copied his work, a plaintiff must again establish two elements. First, the plaintiff must show that the defendants actually copied his work. Second, the plaintiff must show that the defendants' work "bears substantial similarity to protected expression" in the plaintiff's work. *See, Castle Rock Entertainment, Inc.*, 150 F.3d at 137.

## A. ACTUAL COPYING

The test for determining whether or not actual copying took place was stated by the Second Circuit in *Castle Rock Entertainment Inc.*:

Actual copying may be established either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony.... "[P]robative," rather than "substantial" similarity is the correct term in referring to the plaintiff's initial burden of proving actual copying by indirect evidence.

*Castle Rock Entertainment, Inc.*, 150 F.3d at 137(citations and internal quotation marks omitted). Access may be found where the defendant had a "reasonable opportunity" to see the copyrighted work

prior to creating the allegedly infringing work. *Gaste v. Kaiserman,* 863 F.2d 1061, 1067 (2d Cir.1988). " 'Probative similarity,'—the standard for determining copying as a factual matter—is a less-demanding standard than 'substantial similarity'—the standard for determining whether copying is actionable as a legal matter." *O.P. Solutions, Inc. v. Intellectual Property Network, Ltd.,* No. 96 Civ. 7952(LAP), 1999 WL 47191, at *3 (S.D.N.Y. Feb.2, 1999). Probative similarities are those that "in the normal course of events, would not be expected to arise independently in the two works." *Id.* (citing MELVILLE B. NIMMER ET AL., NIMMER ON COPYRIGHT, § 13.03[B], at 13–11 to 13–13).

■ Here, the Court finds that indirect evidence in the record creates a triable issue of fact as to whether or not the defendants actually copied the plaintiff's scripts. First, there is evidence that the defendants had access to the plaintiff's scripts prior to the creation of their commercials. It is undisputed that the plaintiff sent his scripts to A–B in 1990, and that A–B kept the scripts. Lachky claims that he never reviewed unsolicited submissions, but this is entirely inconsistent with the evidence in the record regarding A–B's policy at that time. The policy was designed so that unsolicited submissions would be routed to a particular Brand Manager, who would review the submission and then respond to sender. Moreover, Lachky's letters indicate that he did review such submissions on at least some occasions. Therefore, there is a triable issue of fact as to whether or not Lachky saw the plaintiff's scripts prior to the creation of the Budweiser Frogs commercials. Moreover, the Court finds that there is a triable issue of fact as to whether or not Lachky had contact with Michael Smith prior to the date that Smith and his advertising firm wrote their commercial. While Lachky testified that he had never met Smith prior to the day that the frogs commercial was first proposed to A–B, Smith testified that he had met with Lachky several times before that date. Moreover,

there is at least a "probative similarity" between two commercials for Budweiser Beer involving hip, humorous frogs, where one involves a frog that croaks "Bud Bud" and the other involves frogs who croak "Bud," "weis" and "er." Accordingly, the plaintiff has demonstrated a genuine issue of material fact as to whether or not the defendants actually copied his scripts.

## B. SUBSTANTIAL SIMILARITY

■ A finding of substantial similarity requires that the copying [be] quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred. *The qualitative component concerns the copying of expression, rather than ideas* [, facts, works in the public domain, or any other non-protectable elements].... The quantitative component generally concerns the amount of the copyrighted work that is copied, which must be more than "de minimis."

*Castle Rock Entertainment, Inc.,* 150 F.3d at 138 (citation omitted, emphasis added). Again, "[t]he similarity to be assessed must concern the expression of ideas, not the ideas themselves." *Warner Bros. Inc. v. American Broadcasting Companies,* 720 F.2d 231, 239 (2d Cir.1983). As the Second Circuit held in *Warner Bros, Inc.,*

[t]hough the issue of substantial similarity is frequently a fact issue for jury resolution ... a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only "non-copyrightable elements of the plaintiff's work" ... or because no reasonable jury, properly instructed, could find that the two works are substantially similar.

*Id.* at 239–40.

■ Where the plaintiff's claim is that the defendants' character infringes his copyrighted character, the Court "must consider the 'totality of [their] attributes and traits' as well as the extent to which

the defendants' characters capture the 'total concept and feel'" of the plaintiff's character. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir.1986)(*citing Warner Brothers Inc.*, 720 F.2d at 241), cert. denied, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). As the Second Circuit held in *Warner Brothers,*

> care must be taken to draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appearance, behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one.

720 F.2d at 242.

■ Applying these principles of law to the facts of this case, the Court finds as a matter of law that the defendants' frogs are not substantially similar to the plaintiff's frog. It is true that all of the characters at issue here are frogs who promote Budweiser Beer. However, the idea of using a frog to promote beer is not subject to copyright protection. Apart from the fact that they are frogs, the greatest similarity between the characters is that the plaintiff's frog croaks "BUD BUD," while the defendants' frogs croak "Bud," "weis" and "er." However, the differences between these characters far outweigh the similarities. For instance, the plaintiff's frog croaks "BUD BUD" only once in one of his seven scripts. Moreover, the fact that the plaintiff's frog croaks "BUD BUD" is only important in the context of that particular script. In that script, the plaintiff creates an amusing variation of the well-known story of the princess who kisses a frog, thereby turning the frog into a prince. While the other frog in the

script croaks "RRIBBET RRIBBET," the plaintiff's frog croaks "BUD BUD," thereby setting up the scenario where the female actress chooses Budweiser Beer over the possibility of finding a prince. However, the plaintiff's frog does not make the "BUD BUD" sound in any of the other scripts, clearly demonstrating that the ability to croak "BUD BUD" is not a central or even important characteristic of the plaintiff's frog overall. Clearly, the most well-defined characteristics of the plaintiff's frog are his hip attitude and his appearance, which is semi-human[4] and involves wearing various outfits along with his neon green mirrored sunglasses. The scripts do not provide a physical description of the frog. The plaintiff's frog plays the role of a sort of "master of ceremonies," who with the exception of the first script, does not appear until after the human actors in the commercial have made a choice to drink Budweiser Beer. At that point in the commercials, the plaintiff's frog appears and expresses his approval toward the commercials' protagonists. The overall feel of the commercial is that Budweiser Beer is hip and even more desirable than things such as romance or being rescued from a deserted island.

Turning to the defendants' frogs, it is obvious that they have almost nothing in common with the plaintiff's frog. The defendants frogs are clearly mere frogs, who happen to live in a swamp near a bar that advertises and serves Budweiser Beer. The only "human" qualities that these frogs possess are the ability to read[5] and the ability to make certain vocal sounds and facial expressions. When the first frog croaks "Bud" in the first commercial, it is presumably not because that is the only sound that he can make, but rather is because he is reading the first syllable of the Budweiser sign above him. Moreover, their ability to make the "Bud," "weis," and "er" sounds is perhaps the defendants'

---

**4.** At the end of the plaintiff's first script, the frog is described as "standing upright, leaning on a tree with his legs crossed."

**5.** It appears to the Court that in the first commercial, the three frogs are attempting to read the Budweiser sign.

frogs' single most distinctive feature, and is present in all of the defendants' commercials. No human beings appear in the defendants' commercials. The overall theme and feel of the defendants' commercials is that Budweiser Beer has a universal appeal, extending even to frogs. As a result of this appeal, the otherwise ordinary frogs do things that have humorous and unexpected results, such as jumping into a speedboat, attaching their tongues to a speeding delivery truck, and attaching their tongues to a frozen can of beer. The defendants' later commercials focus primarily on the humorous actions of the two lizards, Louie and Frankie, with the frogs playing only a minor role.

Accordingly, the Court finds the copying, if any occurred, is not quantitatively and qualitatively sufficient to support the legal conclusion that infringement has occurred. The Court further finds that because of the vast differences between the "attributes and traits" of the parties' frogs, and because of the differences in the "total concept and feel" of the two works, no reasonable jury could find that the two works are substantially similar. Therefore, the defendants are entitled to summary judgment on the copyright infringement claim.

## II. PLAINTIFF'S STATE LAW CLAIMS

 The plaintiff has also alleged causes of action for breach of implied contract, promissory estoppel, unjust enrichment and misappropriation. The defendants contend that all of these state-law causes of action are preempted by 17 U.S.C. § 301, which, with certain exceptions not applicable here, preempts all legal or equitable rights within the general scope of federal copyright law, as well as any equivalent rights, found under state law. At oral argument, the plaintiff conceded that his claims for promissory estoppel, unjust enrichment and misappropriation should be dismissed. However, in his memorandum of law opposing summary judgment and at oral argument, the plaintiff maintained that his claim for breach of implied contract is not preempted, because he is seeking to recover for the "defendants' unlawful use of *uncopyrightable* elements [ideas] in his scripts." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, p. 38)(emphasis added). However, the plaintiff's complaint clearly states that his breach of implied contract claim is based upon the defendants' alleged use of his "copyrighted works." (Plaintiff's Complaint, ¶¶ 47–48). Accordingly, the Court also finds that the breach of implied contract claim is preempted and should also be dismissed. *See, Markogianis v. Burger King Corp.*, No. 95 CIV. 4627(JFK) 1997 WL 167113 at *2, 5–6 (Apr. 8, 1997 S.D.N.Y.), *motion for reconsideration denied*, 1997 WL 701338 (Nov. 7, 1997 S.D.N.Y.). In any event, even if the Court had found that the plaintiff's claim for breach of implied contract was not preempted, the Court would have declined to exercise supplemental jurisdiction over that claim, pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

Accordingly, the defendants' motion [# 16 ] for summary judgment is granted in its entirety, and this action is dismissed, with prejudice.

So ordered.